[No. B168586. Second Dist., Div. Three. Feb. 28, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
GERARDO AVITIA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2 and 3 of the Discussion.

**COUNSEL**

Joan Wolff, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and Laura H. Steuch, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ALDRICH, J.**—Defendant and appellant Gerardo Avitia was convicted by a jury of discharging a firearm in a grossly negligent manner and possession of an assault weapon, and sentenced to two years in prison. Although no Penal Code section 186.22, subdivision (b)(1)[1] gang enhancement was alleged, and although there was no evidence the charged crimes were related to any gang activity, the trial court admitted, over Avitia's objection, evidence that gang graffiti was found in Avitia's bedroom. In the published portion of the opinion, we conclude that admission of this evidence, which was unrelated to any issue at trial, requires reversal of Avitia's conviction for grossly negligent discharge of a firearm. In the unpublished portion of the opinion, we conclude the trial court further erred by allowing Avitia to be impeached with evidence he had failed to abide by the conditions of his probation, and that the evidence was sufficient to support the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

 a. *People's case.*

On February 22, 2003, at approximately 3:30 p.m., Angelica Gaeta called 911 reporting that Avitia had fired two shots from a handgun five minutes

---

[1] All further undesignated statutory references are to the Penal Code.

earlier. As Gaeta spoke with the 911 operator, she stated, "You know when they're shooting the guns and there's not bullets in it? [¶] . . . [¶] They're doing that right now." The operator asked, "They're dry firing it?" and Gaeta replied affirmatively. She stated, "And this is happening . . . just . . . way too much . . . . It's like the third time."

Deputy Sheriff Martin Rios and his partner responded to the call. Gaeta told Rios she had "heard . . . two to three gunshots that were fired by her neighbor" in his backyard. In a field showup, Gaeta identified Avitia as the shooter. Gaeta stated that the firearm was a handgun about the size of Avitia's hand, but could not say what type or color. Avitia had held the gun in one hand while shooting. Based upon Gaeta's description, Rios concluded the firearm in question was a handgun. Gaeta appeared nervous about being identified as the complainant and stated she did not wish to walk outside and be seen by Avitia.

Deputies were given permission to search the Avitia residence by Avitia's father. While seated in the police car, and before the house was searched, Avitia became agitated, kicked at the windows of the police car, and yelled to his father, "No, don't let them in."

The search revealed numerous firearms and ammunition located in various areas of Avitia's bedroom. Deputies discovered a .177-caliber, carbon dioxide powered pellet pistol; a Taurus .38-caliber revolver, fully loaded with five live .38-caliber rounds; a Baretta 92 FS .9-millimeter, loaded with 15 live rounds; an unloaded, inoperable .357 magnum revolver; a 12-gauge shotgun; and a Romak Model 991 AK-74, a Romanian version of the AK-47 assault rifle. The Taurus revolver had an approximate two-inch barrel, and was one of the smallest .38's available. Deputy Brandt House, who participated in the search, did not examine the pellet gun closely.

An extra magazine containing 15 rounds was found with the Baretta. Next to the bed was a large, military-style ammunition box containing two 30-round magazines, fully loaded with 7.62 by 39-millimeter rounds consistent with the assault rifle. Several loose rounds were also in the ammunition container. An empty "speedy loader,"[2] four expended .38-caliber casings, and one live .38-caliber round, were sitting on the bed. The casings were not tested to determine from which firearm they had been shot.

---

[2] According to Deputy House, a "speedy loader" is a device used to load all the chambers of a revolver at the same time, eliminating the need to load each chamber one by one, by hand.

However, the casings were .38-caliber and could have been fired from the .38-millimeter Taurus revolver, but not from any of the other firearms found in Avitia's bedroom. The Taurus .38-caliber revolver smelled as if it had been recently fired. "Chivo" was tattooed on Avitia's left hand and written on the ammunition box, as well as on other items in the room. According to the prosecutor, "Chivo" was also scratched on the butt of the assault rifle. Gang graffiti was present on several of the posters in Avitia's room.

According to Deputy House, it is legal to possess and fire a pellet gun.

At trial, Gaeta claimed to have little or no memory of the incident.[3] After her testimony, a tape recording of her 911 call was played for the jury. Deputy Phillip Solano testified that he had spoken to Gaeta and she had expressed her fear of testifying several times. On May 29, 2003, the Thursday before trial began, Gaeta telephoned Solano and told him she did not wish to testify. Approximately one week prior to her call, Avitia's father had gone to Gaeta's home, told her not to come to court and not to testify, and stated that he did not know what his son would do when he was released from jail. Gaeta was "very afraid."

After the 911 tape was played in her presence, Gaeta admitted regaining some of her memory of the incident. She testified that she was not familiar with handguns and did not know whether a pellet gun sounded different than other firearms. When presented with both the pellet gun and the .38-caliber Taurus revolver, Gaeta stated she did not know which gun she had seen being fired. She testified she had not been wearing her contact lenses at the time, and would not have been able to tell the difference between the firearms.

A licensed gun dealer, testifying as an expert, stated that the AK-74 was an assault weapon. Prior to January 1, 2000, sales of the AK-74 were legal.

---

[3] At trial, Gaeta testified she did not know or recognize Avitia, did not know if he had been a resident at the house next to hers, and did not know who lived in the house. She had heard a noise like a tire popping or firecrackers on the date in question but did not know what it was, and did not recall "anything after that." She did not recall calling police or being asked to identify Avitia, although she remembered that a deputy sheriff came to her house, looked in her backyard, and asked her if she had heard noises. She had "a very bad memory," made worse because she was studying for school examinations and was "stressed." Gaeta denied that Avitia's father had come to her home and told her not to testify. She could not recall whether she told officers she was afraid of retaliation. She testified, however, that she "wouldn't lie to a police officer, I know that."

## b. *Defense case.*

Avitia testified in his own defense. He claimed that he had been shooting at a can in the backyard with the pellet pistol. He admitted that with the exception of the .9-millimeter Baretta, all the weapons found in the bedroom were his, as was the ammunition box. He and his father occasionally went to target practice together, and the spent casings found on the bed had come from such target practice. He did not know why he saved the casings. During cross-examination, he demonstrated holding the pellet pistol, and described it as being approximately twice as big as his hand. The pellet gun made a sound when fired, but did not sound like a tire exploding. The .38-caliber revolver made a louder sound when fired than did the pellet pistol.

Avitia admitted owning the AK-74 rifle. He further admitted he had not registered it. He had purchased it in Los Angeles County in 1999, and believed it had been registered when he purchased it.

Avitia also admitted that on May 28, 2002, he had pleaded guilty to carrying a concealed firearm (§ 12025) and carrying a loaded firearm (§ 12031). The jury was instructed that the prior convictions were admitted only for consideration on count 4, the misdemeanant in possession of a firearm charge.[4]

Avitia testified that he had been a small arms repairman in the United States Marine Corps. He had served in the Marine Corps for four years, achieved the rank of lance corporal, and was honorably discharged. He had passed the Marine Corps's background check, as well as the background check run by the gun dealer when he purchased the rifle. He testified that based on his Marine Corps training, he would never fire firearms at a private residence with people living in the area.

## c. *People's rebuttal.*

Deputy House testified that, according to the automated California Law Enforcement Tracking System (C.L.E.T.S.), the .38-caliber Taurus and another weapon, unconnected with the instant case, had been properly registered to Avitia. The C.L.E.T.S. database did not indicate any other weapon belonging to Avitia had been registered.

---

[4] Additionally, during the People's case, the trial court took judicial notice of one of the prior convictions.

2. *Procedure.*

Avitia was charged with discharging a firearm in a grossly negligent manner (§ 246.3), possession of an assault weapon (§ 12280, subd. (b)), the manufacture, sale, import, or loan of a large-capacity magazine (§ 12020, subd. (a)(2)), and possession of a firearm by a misdemeanant (§ 12021, subd. (c)(1)). At the close of the People's case, the trial court dismissed the section 12020, subdivision (a)(2) charge for insufficiency of the evidence, pursuant to section 1118.1. The jury convicted Avitia of the remaining three counts. It found true the allegation that during commission of the section 246.3 violation, Avitia personally used a firearm within the meaning of sections 1203.06, subdivision (a)(1) and 12022.5, subdivision (a). After the jury's verdict, the trial court dismissed the possession of a firearm by a misdemeanant charge because the prior convictions proved by the People were not qualifying prior convictions for purposes of section 12021, subdivision (c)(1). The trial court sentenced Avitia to a term of two years in prison, imposed a restitution fine, and assessed a suspended parole revocation fine. Avitia appeals.

## DISCUSSION

1. *The trial court's improper admission of evidence requires reversal of count 1.*

a. *Admission of gang evidence.*

Prior to trial, defense counsel moved to exclude any reference to gang graffiti found in Avitia's room on grounds the evidence was irrelevant. The prosecutor made an offer of proof that the evidence was relevant to connect Avitia to the guns. He explained that a witness would testify gang graffiti and gang names were found in the bedroom where the firearms and "accessories" were found; that similar gang graffiti and writing was found on ammunition boxes containing the large capacity magazines; that "Chivo" was written on the butt of the AK-74 and on the ammunition box; and that "Chivo" was tattooed on Avitia's hand. Defense counsel offered to stipulate to Avitia's ownership of the AK-74 rifle. The prosecutor declined to accept the stipulation. The trial court did not make a ruling on Avitia's request at that time.

As noted, at trial Deputy House testified that he had observed gang graffiti on posters in Avitia's room. The trial court overruled defense counsel's nonspecific objection to the testimony, on the condition the prosecutor lay a

foundation for the evidence. The prosecutor then queried whether House had worked on the "gang enforcement team." Avitia's further objection that the evidence was inadmissible under Evidence Code section 352 was overruled without discussion. House then testified that he had worked on the sheriff's department's gang enforcement team for four years; during his three-year assignment at the men's central jail and during his tenure at the Lynwood/Firestone station, he had spoken with hundreds of gang members about all aspects of gang life; he had had contact with Hispanic gangs and gang members; and had seen gang graffiti in the jails "[a]ll the time." He was therefore familiar with gang graffiti. No further details were elicited regarding the nature of the graffiti observed on the posters.

### b. *Admission of the gang evidence was error.*

■ Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. (Evid. Code, §§ 210, 352; *People v. Carter* (2003) 30 Cal.4th 1166, 1194 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239–240 [72 Cal.Rptr.2d 572]; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449 [69 Cal.Rptr.2d 16].) A properly qualified gang expert may, where appropriate, testify to a wide variety of matters, including gang graffiti. (*People v. Ochoa* (2001) 26 Cal.4th 398, 438–439 [110 Cal.Rptr.2d 324, 28 P.3d 78]; see also *People v. Killebrew* (2002) 103 Cal.App.4th 644, 656–657 [126 Cal.Rptr.2d 876], and authorities cited therein.)

■ However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" (*People v. Sanchez, supra,* 58 Cal.App.4th at p. 1449; *People v. Ruiz, supra,* 62 Cal.App.4th at p. 240.) In cases not involving a section 186.22 gang enhancement, it has been recognized that "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [16 Cal.Rptr.3d 880, 94 P.3d 1080]; see also *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345 [128 Cal.Rptr.2d 411].) Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66 Cal.Rptr.2d 123,

940 P.2d 710]; *People v. Carter, supra,* 30 Cal.4th at p. 1194 [evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged, and must be carefully scrutinized]; *People v. Gurule* (2002) 28 Cal.4th 557, 653 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; *People v. Carter, supra,* 30 Cal.4th at p. 1194; *People v. Waidla* (2000) 22 Cal.4th 690, 723 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

We agree with Avitia that the trial court abused its discretion by admitting the testimony that gang graffiti was observed on the posters. The crimes were not alleged to be gang related. No section 186.22 gang enhancement was alleged. The only theory upon which the evidence appears to have been admitted was that it tended to link the firearms with Avitia. But no such link was apparent from Deputy House's testimony. House did not testify about the nature or content of the gang graffiti on the posters. There was no showing that Avitia was named in the graffiti, either by his real name or a nickname of "Chivo." There was no showing any of the guns were referenced in the graffiti. There was, therefore, no evidentiary link between the gang graffiti and the ownership of the guns. The gang evidence was completely irrelevant to any issue at trial.

Moreover, even if the evidence had somehow proved the guns belonged to Avitia, such evidence was unnecessary because it was offered on an undisputed issue. (See *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905 [184 Cal.Rptr. 165, 647 P.2d 569] [plur. opn.]; *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1494–1495 [25 Cal.Rptr.2d 644].) The deputy testified that "Chivo" was found on several of the seized items. According to the prosecutor, "Chivo" was scratched on the butt of the AK-74; it would therefore have been observed by jurors. There was also testimony that "Chivo" was tattooed on Avitia's hand, and he displayed his hand for the jury. The indisputable tattoo evidence could hardly have failed to link Avitia to the items found in his room bearing the same name. Further, Avitia offered to stipulate that the AK-74 was his. Given the strength of the tattoo evidence and the absence of a

dispute the weapons were Avitia's, admission of the graffiti evidence lacked any probative value. (See, e.g., *People v. Cardenas, supra,* at pp. 903–905 [admission of evidence that witnesses and defendant were members of the same gang was an abuse of discretion where other evidence had amply established the witnesses and defendant were friends and lived in the same neighborhood]; *People v. Maestas, supra,* at p. 1495.) " '[T]he prosecution has no right to present cumulative evidence which creates a substantial danger of undue prejudice to the defendant.' [Citation.]" (*People v. Cardenas, supra,* at p. 905.) Here, the only possible function of the gang evidence was to show Avitia's criminal disposition.

 c. *Prejudice.*

■ Thus, we turn to the question of prejudice. The erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded. (Evid. Code, § 353, subd. (b); *People v. Earp* (1999) 20 Cal.4th 826, 878 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Jordan* (2003) 108 Cal.App.4th 349, 366 [133 Cal.Rptr.2d 434]; *People v. Bojorquez, supra,* 104 Cal.App.4th at p. 345; *People v. Escobar* (1996) 48 Cal.App.4th 999, 1025 [55 Cal.Rptr.2d 883].) Here, the gang evidence was quite limited. Deputy House did not testify that Avitia was a gang member or associate, nor did he describe gang activities, culture, or crimes. Nonetheless, on the facts of this case, we conclude admission of the evidence was prejudicial in regard to count 1, grossly negligent discharge of a firearm.[5] The testimony that gang graffiti was found in Avitia's room clearly insinuated that Avitia was a gang member. House's recitation of his experience dealing with criminal street gangs, coming immediately after the testimony about the posters, cannot but have strengthened this impression. As Avitia argues, gangs are generally held in low regard among law-abiding citizens. It is common knowledge that gang members commit crimes, often with firearms. House's testimony that he had spoken with hundreds of gang members at the men's central jail emphasized that gang members frequently engage in criminal behavior. As we have noted, it is well-settled that evidence a defendant is a gang member may be highly inflammatory. (E.g., *People v. Gurule, supra,* 28 Cal.4th at p. 653.)

Such was the case here. Evidence that Avitia was a gang member would have seriously undercut his defense. Avitia's account of events was not implausible. He claimed he was firing the pellet gun—which was not alleged

---

[5] Avitia does not contend admission of the gang evidence requires reversal on the possession of an assault weapon count.

to be a crime—rather than the revolver. There was no dispute a pellet gun was found in his room. At least according to defense counsel's argument to the jury, the pellet gun resembled a revolver: "[I]t looks very real." On the other hand, the People's case was not overwhelming. Even setting aside her transparently disingenuous trial testimony, Gaeta did not originally provide a great deal of detail to deputies, except to say the firearm was a handgun about as big as Avitia's hand. She testified, after her memory had purportedly been refreshed, that she was not familiar with handguns or pellet guns. This testimony was neither implausible nor inconsistent with her original statements to deputies, and tended to support Avitia's theory that she mistook the pellet gun for a handgun. The People presented no evidence that bullet holes, impact marks, or casings had been found in the backyard. Further, although the sound of gunfire had prompted Gaeta's 911 call, at the time she spoke with the operator Avitia was firing *without* bullets. No evidence was adduced to show that the reported "dry firing" was more consistent with use of a revolver than a pellet gun.[6]

In sum, Avitia's credibility was key to the success of his defense. If his testimony was believed, he was a former small arms repairman in the United States Marine Corps and a gun hobbyist, who was simply conducting target practice with a pellet gun, an activity the People did not contend was unlawful.[7] Evidence Avitia was a gang member, on the other hand, suggested to the jury that he had a criminal disposition and was therefore guilty as charged (*People v. Carter, supra,* 30 Cal.4th at p. 1194), that his story was probably false, and that his arsenal of guns, in the hands of a gang member, presented a special danger to the community. On the facts of this case, the erroneous admission of the evidence was prejudicial error on the grossly negligent discharge of a firearm count.

2., 3.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] Of course, firing a gun without bullets could not "result in injury or death to a person," an element of a section 246.3 violation. (§ 246.3; see also *People v. Robertson* (2004) 34 Cal.4th 156, 167 [7 Cal.Rptr.3d 604, 95 P.3d 872].) Gaeta's statements, while not entirely clear, are susceptible to the interpretation that prior to the "dry firing," Avitia was firing with ammunition.

[7] As noted, a deputy testified that it was legal to fire and possess a pellet gun. We express no opinion on whether the deputy's testimony was a correct statement of the law.

[*]See footnote, *ante,* page 185.

## DISPOSITION

The judgment is reversed as to count 1, grossly negligent discharge of a firearm, and affirmed on count 2, possession of an assault weapon. The matter is remanded for further proceedings consistent with this opinion.

Klein, P. J., and Croskey, J., concurred.