Filed 10/31/13  P. v. Savoy CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>FRANK SAVOY, JR.,<br><br>     Defendant and Appellant. | A132866<br><br>(Alameda County<br>  Super. Ct. No. 163568A and<br>  Super. Ct. No. 159182A) |

This is an appeal from judgment after a jury convicted defendant Frank Savoy, Jr. of murder, armed first degree robbery, forcible rape, forcible oral copulation and attempted murder with various enhancements for, among other things, use of a deadly weapon and personal and intentional discharge of a firearm.  The trial court thereafter found true that defendant had two prior felony convictions, and sentenced him to a total prison term of 78 years to life.  Defendant now challenges this judgment on grounds that include erroneous exclusion of key defense evidence, improper jury instruction, and improper consolidation of charges.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On February 4, 2011, defendant was charged by consolidated information with the murder of Bobby Hall on July 19, 2008 (Pen. Code, § 187)[1] (count one), enhanced for the alleged personal and intentional discharge of a firearm causing great bodily injury and death and personal use of a firearm (§§ 12022.53, subds. (b), (c), (d), (g), 12022.7, subd.

---

[1]     Unless otherwise stated, all statutory citations herein are to the Penal Code.

1

(a) and 12022.5, subd. (a)).  Defendant was also charged with the following crimes against Jane Doe on July 31, 2008:  (1) armed first degree robbery enhanced for the alleged use of a deadly weapon (§ 211; §12022, subds. (a)(1), (b)(1)) (count two); (2) armed forcible oral copulation (§ 288a, subd. (c)(2)(A)) (counts three and four); (3) forcible rape (§ 261, subd. (a)(2)) (count six); and (4) attempted murder (§ 187, subd. (a), § 664) (count seven).[2]  The consolidated information further alleged defendant had three prior felony convictions.  (§ 667.5.)  A trial by jury began March 2, 2011, at which the following evidence was produced.

# I      The Prosecution's Case.

## A.  Bobby Hall's murder (Case No. 163568A).

On July 19, 2008 in the late evening, Bobby Hall was killed by a shotgun wound to the back of the head while sitting on a couch in the living room of the Oakland apartment of his longtime friend, 27-year-old Jamie Holloway.  The three men involved in his murder — to wit, defendant (also known as "Frank Nitti"), Taron Deary (also known as "Teeda") and Paul Tanner (also known as "Nutso") — mistook Hall for a man named "J-Rock," against whom they had a grudge.  Specifically, J-Rock, who had dated Holloway's cousin, had recently been involved in a violent altercation with Deary and his friend Webster Johnson (also known as "Webby"), during which J-Rock fired gunshots at the other men, an offense that had not yet been redressed.[3]

Earlier that evening, 21-year-old Deary believed he had seen J-Rock in the passenger seat of Holloway's car as it drove by the men's hangout at the corner of MacArthur Boulevard and Ritchie, prompting the men to drive to Holloway's apartment in the 6800 block of MacArthur Boulevard, which Deary had visited before.  According to Deary, defendant first drove his white Cadillac to 69th Avenue, near Holloway's

---

[2]      Count five, another count of forcible oral copulation, was dismissed by the prosecutor before trial.

[3]      Holloway had recently broken up with Johnson after a two-year relationship and knew J-Rock as someone who had dated her cousin.  She knew Tanner, Deary and defendant as people who used to hang out together on MacArthur Boulevard.

apartment, with Deary in back and Tanner in front.[4]  Once there, defendant turned off the engine and told Deary to get in the front seat.  Defendant then went to the backseat on the driver's side and retrieved a two-and-one-half-foot shotgun from under the seat before leaving the car with Tanner, who was armed with a .22-caliber revolver.

A short time later, Deary, who remained in the car, heard one loud gunshot followed by a quieter one.  Thirty seconds later, defendant and Tanner returned to the car, both with hoodies up and defendant with the shotgun.  Deary drove the car away from the scene before returning to his mother's house.  The next day, Deary learned a man in Holloway's apartment had been killed and, the next week, he learned the man was not J-Rock.

The subsequent police investigation yielded the following evidence.  Homicide Sergeant Caesar Basa found Hall's body on the couch leaning up against the window.  Evidence technicians found two holes in the wall of Holloway's apartment, which came from bullets fired through a window.  Sergeant Basa determined based on the evidence that two shooters were present outside the apartment.  He surmised the mortal shot had been fired from a shotgun or high-caliber weapon based on the absence of an exit wound on Hall's body.  An autopsy confirmed Hall died from a shotgun wound to the back of the head that did not leave the body.  Evidence of shotgun wadding removed from Hall's head and "splitting of the skin" near the wound indicated the mortal shot was fired from close range.

On December 3, 2008, Deary, in custody on an unrelated matter, was interviewed by Sergeants Basa and Cruz regarding Hall's murder based on a tip they had received.  He denied any knowledge of the crime.

---

[4]  Deary, like Paul Tanner, testified at trial for the prosecution in exchange for a lesser sentence.  Deary pleaded guilty to involuntary manslaughter and received an 11-year sentence in exchange for truthful testimony.  Tanner, who was initially charged with Hall's murder, pleaded guilty to manslaughter, as well as to robbery in connection with the consolidated case involving Jane Doe and, in exchange for truthful testimony, received a sentence of 23 years and eight months.

Tanner, in turn, was first interviewed by police based on a tip on December 17, 2008. He, like Deary, denied knowledge of Hall's murder. Several months later, however, after being arrested for auto theft, Tanner decided to "get it over with" and tell the truth. Specifically, during another custodial interview by police on August 5, 2009, Tanner admitted he was a few feet away when defendant killed Hall with a two-and-one-half-foot sawed-off shotgun through the window of Holloway's apartment. Tanner, 17-years old and armed with a .22-caliber revolver, was acting as defendant's lookout. When defendant instructed him to shoot into the apartment through the kitchen window, he acquiesced twice, but made sure to aim at the ceiling to avoid injuring Holloway or her young son. According to Tanner, Deary, who was unarmed, drove them away from the murder scene. Two days later, Tanner learned the victim was someone other than J-Rock, to which news defendant responded: "Oh, well." Defendant then told Webster Johnson: "I knocked him down for you."

Based on Tanner's information, Deary was interviewed again by homicide detectives on September 10, 2009. This time, Deary admitted some involvement in Hall's murder and identified defendant from a photograph.[5]

Sergeant Basa subsequently obtained an arrest warrant for Deary and, on September 9 and 10, interviewed both Deary and defendant. During this interrogation, a recording of which was played to the jury, defendant was shown portions of Tanner's and Deary's custodial interviews in which they implicated him in Hall's shooting. Defendant initially denied any involvement in the crime, but later changed his story to admit driving the other men to Holloway's apartment, yet insisting he remained in the car, unarmed, during the shooting.

On November 10th, Deputy Sheriff Damon Leroy Jones was monitoring inmate phone calls and mail at Santa Rita jail, where defendant was being housed. Deputy

---

[5] Deary admitted writing a letter from jail on December 5, 2008 to his then-girlfriend, informing her that homicide detectives had talked to him regarding the incident he had told her about — to wit, the incident when defendant and Tanner killed someone and he was driving.

4

Sheriff Jones recovered an item of mail listing defendant's jail identification number as the return address. This letter referenced kidnapping, assault with a deadly weapon and murder. Shortly thereafter, police seized additional letters written by defendant at his girlfriend's mother's house.[6]

### B. Jane Doe's Home Invasion and Sexual Assault (Case No. 159182A).

On July 31, 2008 at about 6:15 a.m., 41-year-old Jane Doe was asleep in her bedroom in the Oakland residence she shared with her husband, who had already left for work. She heard the security gate open, but thought it was her husband until she heard a voice say: "Don't move bitch." Although Jane could not see well without her glasses, she could see the voice came from a short African-American man aiming a gun at her. This man, later identified as Paul Tanner, armed with the same .22-caliber gun he used on July 19, 2008, told her to lay on the floor before hitting her and telling her to sit in a chair in the living room. At this point, another man, later identified as defendant, entered the house wearing a black hooded sweatshirt and a facemask covering his mouth and nose. He was armed with a .44-caliber gun. He told Jane if she obeyed she would not get hurt, before proceeding to hit her on the head with a hammer.

Tanner began to rob the house while defendant ordered Jane to go to the bedroom and sit on the bed. Removing his pants, defendant ordered Jane to orally copulate him. When Tanner entered the room, defendant asked him for something to wipe blood from Jane's head wound off his stomach. At this point, Jane tried to escape, but slipped, allowing defendant to grab her and place his hands on her neck as if he were about to kill her. He then took her back to the bedroom, where he again forced her to orally copulate him before putting on a condom and inserting his penis into her vagina.

When defendant finished, he asked Tanner whether he would like to sexually assault Jane Doe, but Tanner declined. Tanner asked Jane Doe where to find money and valuables, which he then took. At some point, defendant took Jane Doe's husband's

---

[6]     The parties stipulated at trial that defendant's girlfriend, Safira Bass, was familiar with his handwriting and was certain he wrote these letters, which were offered into evidence as Exhibits 33 and 34.

guitar and smashed it over her head. He then pointed the gun at her and fired one shot before leaving with Tanner. Jane waited five minutes before calling 911.

Jane Doe was taken to the hospital, where she was treated for numerous serious injuries, including a head injury requiring staples. Jane Doe underwent a sexual assault examination that confirmed she had been raped. She later reported as stolen her purse, laptop, digital camera, watch and jewelry. Jane Doe also described to police a hooded sweatshirt with a "teeth" design worn by defendant, and identified her jewelry boxes and laptop from photographs.

The subsequent police investigation yielded the following physical evidence. Evidence technicians recovered from the scene a hammer, a condom wrapper, and a bullet and jacket from a .22-caliber Magnum or Special. A bullet hole was found on the floor, and fingerprints were recovered from two jewelry boxes and from a piece of a broken guitar. The fingerprints on the jewelry boxes were later identified as Tanner's.

On August 1, 2008, the day after the incident, Oakland Police Officer Francisco Rojas was approached by 25-year-old Jarika Cox and another person requesting help to remove a threatening person from her Oakland apartment. Cox advised Officer Rojas that defendant, a 10-year acquaintance who occasionally slept at her apartment, had recently become physically and verbally abusive toward her and was refusing to leave her apartment. Among other misdeeds, defendant had been leaving Cox threatening messages and had taken a key to her apartment, prompting her to sleep elsewhere. When Officer Rojas and a second officer went to Cox's apartment, Apondo White, defendant's nephew, opened the door and told them he had Cox's permission to be there. Another woman was lying on the couch. Officers noticed that, where the woman had been sitting, there was a purse, computer bag, sweatshirt, and credit card with the name of Jane Doe. Officer Rojas also noticed a checkbook in Jane Doe's name, a mask with a skull face on it, tucked inside a sweatshirt, and an Apple laptop computer. When Officer Rojas's colleague called the police records unit and gave the name found on the credit card, he learned Jane Doe was a recent crime victim. He then called Jane Doe, who told him that her laptop and purse, among other things, had been stolen, and directed him to Officer

6

Scarrott, who was involved in her case. A search warrant was prepared with information from Officer Scarrott. Thereafter, crime scene technicians recovered from Cox's apartment two black hooded sweatshirts, tennis shoes with blood on one of them, a neoprene face mask, a piece of paper marked with defendant's name found in the pocket of the computer case, and a laptop computer with blood on its left side near the USB port.[7]

A DNA profile was developed for Jane Doe using an oral swab from a sexual assault kit. Similar profiles were later developed for defendant and Tanner using buccal swabs. DNA samples were taken from a blood stain on the right tennis shoe found in Cox's apartment; from the laptop computer, neoprene face mask and black sweatshirt found in Cox's apartment; and from the condom wrapper found in Jane Doe's residence. Through subsequent expert analysis, Jane Doe was found to be the single source of the DNA found in the blood on the tennis shoe; both Jane Doe's and defendant's DNA matched the DNA found on the computer; defendant's DNA matched the DNA found on the face mask and the tennis shoe lace; Jane Doe's DNA matched the DNA taken from blood found on the black sweatshirt; and neither defendant nor Jane Doe could be eliminated as donors to the DNA found on the condom wrapper. Tanner, on the other hand, was eliminated as a donor of the DNA found on the tennis shoe, computer, face mask, black sweatshirt and condom wrapper.

Tanner later testified that he and defendant went, armed, to the area of Ritchie and MacArthur in Oakland in the early morning of July 31, 2008 to rob someone and get some money. They chose Jane Doe's residence after spotting an open window. Defendant, not Tanner, sexually assaulted Jane Doe, hit her on the head, and fired the gun

---

[7]    Cox visited defendant several times in jail and put some money on his books because, Cox explained, she wanted to convince him she was not involved in his arrest. Cox also received a letter from defendant while he was in custody in which he threatened her and attempted to dissuade her from testifying.

7

at her. When Tanner asked defendant whether he killed her, defendant responded: "I think."[8]

### III. The Verdict, Judgment and Appeal.

On April 7, 2011, the jury found defendant guilty of all counts and found true all enhancements. The trial court thereafter found true in a bench trial that defendant had sustained two prior felony convictions. On July 22, 2011, the trial court sentenced defendant to an aggregate prison term of 78 years to life. This timely appeal followed.

### DISCUSSION

Defendant raises four primary issues for our review. First, defendant contends the trial court violated his constitutional right to present exculpatory evidence by excluding evidence from trial relating to Taron Deary's arrest a few months after the murder in possession of a .22 long rifle pistol concealed beneath his sweatshirt. Second, he contends the trial court violated his constitutional rights to due process and a fair trial by refusing to effectively redact from the transcript of his custodial interrogation a reference to his prior prison term. Third, he contends the trial court erred when instructing the jury regarding the prosecutor's burden to produce evidence corroborating accomplice testimony. And, finally, he contends the trial court violated his constitutional rights to due process and a fair trial by granting the prosecutor's request to consolidate the July 19, 2008 murder case (No. 163568A) and the July 31, 2008 home invasion/sexual assault case (No. 159182A). We address each issue in turn.

### I. Exclusion of Evidence of Deary's Subsequent Arrest and Gun Possession.

The first issue relates to the trial court's exclusion of defendant's proffered evidence relating to Deary's arrest in early October 2008 while in possession of a loaded semi-automatic .22-caliber long rifle pistol, about eleven inches long, concealed in his sweatshirt, for which he was charged with a probation violation. Defendant sought to rely on this evidence to bolster his theory that Deary and Tanner, not defendant, had the

---

[8] While in custody, defendant had attempted to blame the crime against Jane Doe on another individual who had since died, Damien Hayden. However, at trial, Tanner denied defendant's story.

shotgun and killed Hall on the night in question. The trial court permitted defense counsel to question Deary about the fact that he was found with the pistol in early October 2008, for impeachment purposes (*People v. Wheeler* (1992) 4 Cal.4th 284, 296-297), but prohibited additional questions relating to the details of Deary's arrest and gun possession on the grounds that such evidence had limited probative value and would cause undue prejudice. According to defendant, this ruling is erroneous and infringed on his constitutional right to present a defense because, as his counsel argued below, it precluded him from: (1) demonstrating that Deary's October 2008 firearm possession made it more likely he also possessed and used a firearm during Hall's murder on July 19, 2008; and (2) arguing that Deary's successful concealment of a long rifle pistol in his sweatshirt in early October 2008 corroborated defendant's exculpatory statement to police that he was not involved in Hall's shooting and was not aware Deary and Tanner were armed and "ready for action on July 19, 2008." The relevant law is not in dispute.

Generally, all relevant evidence is admissible. (*People v. Champion* (1995) 9 Cal.4th 879, 922.) Relevant evidence is that which has any tendency in reason to prove or disprove any disputed fact material to the outcome of the case. (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]' [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.) Moreover, even if relevant, evidence may nonetheless be excluded if the trial court finds that its probative value is substantially outweighed by its prejudicial effect. (*People v. Champion, supra,* 9 Cal.4th at p. 922; Evid. Code, § 352.)

These "ordinary rules of evidence do not impermissibly infringe on the accused's constitutional right to present a defense." (*People v. Lawley* (2002) 27 Cal.4th 102, 155.) As such, the trial court retains "a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*Ibid*.) On appeal, a trial court's decision to admit or exclude evidence is

reviewed solely for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) "The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. [Citation.]" (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193. See also *People v. Dyer* (1988) 45 Cal.3d 26, 73.)

Here, we find nothing arbitrary, capricious, or patently absurd about the trial court's exclusion of the challenged evidence. (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193.) As the trial court noted, the firearm Deary possessed on October 5, 2008 was an 11-inch semi-automatic .22-caliber long rifle pistol, which is quite different in character and size than the two-and-one-half-foot sawed-off shotgun used to kill Hall. As such, we agree with the trial court's finding that the evidence that Deary carried the 11-inch pistol in a dark sweatshirt weeks after the crimes in this case when arrested for a probation violation was, at best, minimally relevant to defendant's theory that he was carrying a two-and-one-half-foot sawed-off shotgun in his shirt on July 19, 2008. Moreover, given the factual distinctions in the subject firearms, we agree with the trial court that the evidence carried an undue risk of confusing or misleading the jury in its consideration of whether defendant committed the murder. As such, the trial court properly found the probative value of the evidence substantially outweighed by its prejudicial impact. (*People v. Champion, supra,* 9 Cal.4th at p. 922; Evid. Code, § 352.)

Finally, and in any event, we conclude that, given the minimal relevance of the evidence that Deary was carrying a significantly different weapon concealed in his clothing several weeks after Hall's murder, it is not reasonably likely that admitting it would have led to a different verdict. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 611-612 [exclusion of evidence, even if erroneous, is harmless if it does not appear reasonably probable verdict was affected].)

Accordingly, there are no grounds for reversing the trial court's decision to exclude this evidence, particularly when we consider this evidence, as we must, in a light most favorable to affirming. (See *People v. Pelayo* (1999) 69 Cal.App.4th 115, 120-121

[on appeal, the court must consider the challenged evidence, and reasonable inferences that may be drawn from it, in a light most favorable to affirming the judgment].)

## II. The Court's Refusal to Further Modify the Record to Conceal the Fact of Defendant's Prior Prison Term.

Defendant's second contention is that the trial court violated his constitutional due process rights by refusing his request to further modify the transcript of his custodial interrogation to delete the phrase "if I was to go XXXX to prison," and replace it with, "if I was to be sent to prison."

As the record reflects, the trial court had earlier granted a defense request to have redacted from both the transcript and recording of defendant's custodial interrogation all references to his having served a prior prison term on the ground that such evidence was more prejudicial than probative. (Evid. Code, § 352.) It was pursuant to this ruling that the transcript was changed from "if I was to go back to prison" to "if I was to go XXXX to prison." However, after the redacted transcript had been prepared and placed in binders for the jury and the next witness was about to take the stand, defense counsel advised the court that, "in retrospect," she believed that using "XXXX" to redact the word "back" from the transcript enabled the jury to nonetheless conclude the deleted word was "back" when it read the entire sentence.[9] As such, defense counsel argued,

___

[9] The relevant portion of the transcript, as set forth in Respondent's Brief, reads as follows:

A. Like if I go to prison, right – right? Like say – say I go up in there and say the moon Martian did it – actually the moon Martian and the Cellar Man told you all that I did it, right? I say man the moon Martian – he the one, you feel me, bounced at the car woo. I didn't even know he had the thang. You feel me? Woo, woo, whatever. Right? When I got . . .

Q. You're not telling me that you're trying to be true to the game and be in prison. Is that what you're trying to tell me? Like I'm gonna be true to the game by not snitching, but you're gonna be in prison.

A. No, what I'm saying . . .

Q. Is that what you're telling me?

A. No, what I'm – no – no, what I'm saying is like if I was to go ____ to prison like they – once I – once I say whatever, whatever, right? Instead, if I indicate somebody did something, whatever, right? It's paperwork on that. It's paperwork."

11

giving the jury the redacted transcript as prepared would effectively undermine the court's earlier ruling to omit all references to his prior prison term.

The trial court rejected defense counsel's request to further alter the transcript as both untimely and unnecessary. According to the court, adding words to the transcript would unnecessarily highlight the phrase, and leaving the transcript "as is" would not necessarily create the inference defense counsel claimed. In fact, the trial court found, it was more likely the jury would infer a "cuss word" had been omitted than the word "back." Defendant herein challenges this ruling.

As stated above, "[u]nder Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.[Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Applying these legal principles here, we conclude the trial court did not err by refusing defendant's request to further modify the transcript of his custodial interrogation in the manner suggested by defense counsel. First, with respect to timeliness, the trial court had a reasonable basis for finding that defense counsel's request arrived too late and would cause undue delay if granted. As the record reflects, the parties had already agreed to the redaction of the transcript, the binders of the transcript were ready for the jury, and the next witness was about to take the stand. It thus is quite understandable the trial court had no inclination to delay trial for the purpose of making counsel's proposed additional change.

Second, with respect to the issue of prejudice, we agree with the trial court that defense counsel's request was not necessary. As the People note, the redacted transcript provided to the jury, when read in context, is susceptible to a number of reasonable inferences having nothing to do with defendant's prior prison term, including, as the trial

12

court pointed out, the inference that an offensive word had been deleted. (Cf. *People v. Burney* (2009) 47 Cal.4th 203, 231 [recognizing the significant prejudice suffered by a defendant where, "despite redaction, the statement obviously refers directly to the defendant, and involves [improper] inferences that a jury ordinarily could make immediately"].)

Finally, even assuming for the sake of argument the trial court's ruling was erroneous, we would nonetheless find the error harmless. This was a lengthy, complicated trial with an enormous record. Within this record, the challenged portion of defendant's custodial interrogation transcript amounts to just one phrase of one sentence. All actual references to defendant's prior prison term, whether written or audio, were successfully redacted, and neither counsel strayed from the order prohibiting mention of it before the jury. Under these circumstances, the possibility that the jury prejudicially relied on that single redacted phrase to render the wrong verdict are quite slim, particularly in light of the trial court's subsequent jury instructions. Specifically, the court instructed the jury before reviewing the transcripts of defendant's interrogation: "As we go through this, you will see there are transcripts, pages where there is something blocked out, this is all silent on the tape. That is because the court ruled those areas are not relevant for the jury to hear, so don't try to speculate what is there or anything like that. Just move on beyond the response." Then, before deliberations, the trial court added: "Do not consider for any purpose . . . any evidence that was stricken by the court. Please treat it as though you had never heard of it." We presume the jury followed these clear instructions and, accordingly, conclude any error on this record was not prejudicial. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1234.) The trial court's ruling thus stands.

## III. Jury Instruction on Evidence Required to Corroborate Accomplice Testimony.

Defendant next argues the trial court committed reversible error by misinstructing the jury with respect to the legal requirement that the prosecutor produce evidence of a certain quality to corroborate the testimony of accomplices. Specifically, as a matter of statutory law, " '[a] conviction can be based on an accomplice's testimony only if other evidence tending to connect the defendant with the commission of the offense

13

corroborates that testimony.' (§ 1111.)  The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime. [Citation.] The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. [Citation.]"[10]  (*People v. McDermott* (2002) 28 Cal.4th 946, 985-986; see also *People v. Sanders* (1995) 11 Cal.4th 475, 534-535.)

The purpose of requiring independent evidence of corroboration is well-understood:  "[T]o prevent convictions from being based solely upon evidence from such inherently untrustworthy sources, the Legislature enacted section 1111 to require corroboration whenever an accomplice provided the evidence upon which a conviction was sought." (*People v. Belton* (1979) 23 Cal.3d 516, 525.)

Here, the prosecution relied upon certain of defendant's own extrajudicial admissions to meet the requirements of section 1111.  Specifically, the prosecution theorized the fact that defendant changed his story to police – first, insisting he knew nothing and was not at the crime scene and, then, admitting that he drove to the scene with accomplices Deary and Tanner, heard gunshots after Deary and Tanner left the car, and then drove away once they returned – tended to prove consciousness of guilt, thereby corroborating Deary's and Tanner's testimony that he was the murderer.  In doing so, the prosecutor relied upon defendant's custodial statements to Sergeant Basa, including his statement  that "Yeah, I was there, I drove, I had no idea what was going on . . . ."

---

[10]     Section 1111 provides in relevant part as follows:  "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ."

14

During trial, based on the prosecutor's theory and over defendant's objection, the trial court gave the following special pinpoint instruction: "Statements of a defendant that are found to be admissions by the jury may be evidence that corroborates an accomplice's testimony." This special instruction followed the trial court's reading of several standard instructions on accomplice testimony, including CALJIC numbers 3.12 and 3.18.[11]

On appeal, defendant raises essentially the same objection his counsel raised below – to wit, that section 1111 does not permit a prosecutor to rely on "a defendant's

---

[11]    The standard instructions, agreed to by the parties, were as follows:

"You cannot find a defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect that defendant with the commission of the offense." (CALJIC No. 3.11.)

"To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime, which, if believed, by itself and without any aid, interpretation, or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged. [¶]

"However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged or that it corroborate every fact to which the accomplice testifies. [¶]

"In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime. [¶]

"If there is no independent evidence which tends to connect defendant with the commission of the crime, the testimony of the accomplice is not corroborated. [¶]

"If there is independent evidence which you believe, then the testimony of the accomplice is corroborated. [¶]" (CALJIC No. 3.12.)

"The required corroboration of the testimony of an accomplice may not be supplied by the testimony of any or all of his accomplices, but must come from other evidence." (CALJIC No. 3.13.)

"To the extent that an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony, You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in this case." (CALJIC No. 3.18.)

15

extrajudicial <u>denials</u> of involvement during a custodial interrogation to establish the requisite corroboration." The following legal principles govern our review of this issue.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218 [8 Cal.Rptr.3d 551, 82 P.3d 755].) Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citations.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.].) 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Applying these principles to this case, we reject defendant's instructional challenge for several reasons. First, as a factual matter, we disagree with defendant's claim that the only evidence offered to corroborate the accomplice testimony of Tanner and Deary was his denial of involvement. Rather, the prosecution offered evidence that defendant did not simply deny, he *changed* his story while in custody from one of no involvement in Hall's murder to one of being present outside the murder scene in Holloway's apartment *and* assisting Deary and Tanner to leave the scene in his vehicle. Second, and in any event, defendant refers us to no authority, and we know of none, that so narrowly defines corroborating evidence for purposes of section 1111. Quite to the contrary, the California Supreme Court holds that, with respect to corroborating evidence, "[i]t is only required that the evidence ' " 'tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is telling the truth.' " ' " (*People v. Sanders* (1995) 11 Cal.4th 475, 535.) Here, we agree with the trial court that evidence of defendant's changed story to police – from a complete denial of involvement to an admission of being present at the murder scene and offering assistance to his accomplices – sufficed to meet this legal requirement based upon its tendency to prove his consciousness of guilt. (See *People v. Williams*

16

(1997) 16 Cal.4th 635, 681 ["the tape recording of defendant's interview with the police (in which defendant admitted being present at the scene of the murders) sufficiently corroborated the testimony of [two accomplices] by connecting defendant to the shooting deaths"]; *People v. Hill* (1967) 66 Cal.2d 536, 556 [substantial corroborating evidence existed for purposes of section 1111 in the form of, among other things, the defendants' own extrajudicial statements]; see also *People v. Perry* (1972) 7 Cal.3d 756, 772 ["attempts of an accused to conceal his identity [citation] or his whereabouts [citation] may warrant an inference of consciousness of guilt and may corroborate an accomplice's testimony" ]; *People v. Avila* (2006) 38 Cal.4th 491, 562-563 [evidence of a defendant's consciousness of guilt may constitute corroborating evidence under section 1111]; cf. *People v. Jenkins* (1979) 91 Cal.App.3d 579, 585 [evidence regarding defendant's continuing use of a false name (the same name he gave when booked on an unrelated charge) and continuing denial of touching narcotics paraphernalia (despite the presence of his fingerprint), while admissible, was nonetheless insufficient to prove the crime of possession with intent to manufacture].)

Accordingly, based on the legal authority set forth above and in light of the particular facts of this case, we find no error in instructing the jury that defendant's statements to the police interrogators denying involvement before ultimately admitting being present at the murder scene and assisting the murderer, if found to be admissions, "may be evidence that corroborates an accomplice's testimony."[12] (CALJIC No. 3.19.) (E.g., *People v. Ramos, supra,* 163 Cal.App.4th at p. 1088 [" 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation' "].) Even accepting for sake of argument

---

[12] The jury was instructed that an "admission is a statement made by the defendant other than at his trial which does not by itself acknowledge his guilt . . . , but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part." (CALJIC No. 2.71.)

We presume, as we must, that the jury followed this straightforward instruction and, thus, did not find any of defendant's statements or actions not properly definable as admissions to be evidence corroborating accomplice testimony.

17

defendant's suggestion the instruction is an overbroad reading of section 1111, we conclude it was nonetheless adequate on this record and that, in any event, the failure to give a more precise instruction delineating when a defendant's admissions may constitute corroborating evidence cannot be deemed prejudicial. (E.g., *People v. Ghent* (1987) 43 Cal.3d 739, 757-758; see also *People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)

## IV.    Consolidation of Charges.

Finally, defendant contends the trial court deprived him of his constitutional right to due process and a fundamentally fair trial by consolidating the charges related to Hall's murder on July 19, 2008, with those relating to Jane Doe's home invasion and sexual assault on July 31, 2008. The following background is relevant.

Before trial, the prosecution moved to consolidate the two cases on the ground that the benefits of consolidation in terms of judicial efficiency outweighed the likelihood of causing undue prejudice to defendant. The trial court granted the motion after finding particularly relevant the facts that both cases involved the same class of crimes (to wit, murder and attempted murder), and that both cases had the same "central figure, the co-defendant [Tanner] in both, testifying at length in both," such that much of the evidence in the two cases would be cross-admissible. Defendant contends this decision must be reversed.

We review a trial court's decision to consolidate charges for abuse of discretion. (*People v. Ochoa* (2001) 26 Cal.4th 398, 423.) In doing so, we keep in mind "[t]he law prefers consolidation of charges." (*Ibid.*) As such, we reverse only if the defendant makes "a clear showing of potential prejudice." (*Ibid.*)

Section 954, in turn, provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory

18

pleadings are filed in such cases in the same court, the court may order them to be consolidated. . . . [T]he court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (§ 954.) Moreover, even where these statutory requirements for permissive joinder are met, severance of the charges may nonetheless be required if joinder "would be so prejudicial that it would deny a defendant a fair trial." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243-1244.)

The California Supreme Court has identified several criteria to aid appellate review of a trial court's ruling on a motion to consolidate or sever charges. Specifically, a trial court's decision to consolidate charges may be an abuse of discretion where: " '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' [Citation.]" (*People v. Ochoa, supra,* 26 Cal.4th at p. 423; see also *Frank v. Superior Court* (1989) 48 Cal.3d 632, 639.)

Here, there is no dispute the crime of murder, which involved the discharge of firearms, and the crimes of attempted murder and forcible rape, which also involved discharge of a firearm, were "of the same class of crimes or offenses." (§ 954; see also *People v. Kemp* (1961) 55 Cal.2d 458, 476 [under section 954, "the same class of crimes or offenses" means offenses "possessing common characteristics or attributes"].) Rather, the dispute is whether the trial court nonetheless abused its discretion in granting the prosecution's consolidation motion based, as defendant argues, on the resulting degree of prejudice. (*People v. Stitely* (2005) 35 Cal.4th 514, 531.)

We conclude there was no abuse of discretion. As the trial court explained, in both cases, the key witness to defendant's violence was his friend and colleague, Paul

Tanner. While defendant undoubtedly sought to attack Tanner's credibility with respect to both set of charges, the trial court nonetheless acted reasonably in finding that the efficiency benefits of consolidation due to Tanner's central role as eyewitness to both crimes significantly outweighed any drawbacks from the inflammatory effect of the evidence on the jury's emotions.

In reaching this conclusion, we acknowledge in particular the evidence relating to defendant's letters from jail that purportedly described plans to kill Jane Doe and other individuals involved in her case to prevent them from testifying. As defendant notes, these letters would not have been produced if the murder case had been tried separately. According to defendant, the prosecutor's closing argument that homicidal intent could be inferred from these letters demonstrates the inflammatory spillover effect of consolidation. Defendant ignores, however, that both cases involved great violence against virtual strangers and, thus, necessarily exposed the jury to a great deal of inflammatory evidence. As such, while, to be sure, inflammatory evidence was presented to the jury at his consolidated trial, we cannot conclude it was unduly so. (*People v. Soper* (2009) 45 Cal.4th 759, 780 [consolidation proper where "[t]he homicides at issue in the [separate] cases are similar in nature and equally egregious—hence neither, when compared to the other, was likely to unduly inflame a jury against defendant"].)

Accordingly, for the reasons stated, we conclude the trial court's consolidation order was within the bounds of its discretion and was not an infringement upon defendant's constitutional rights.

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.