Filed 10/28/20  P. v. Valdez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| THE PEOPLE, | B298544 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA449493) |
| v. | |
| ALEX R. VALDEZ, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County.  Charlaine F. Olmedo, Judge.  Affirmed as modified.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Medeo, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

_____

### *INTRODUCTION*

A jury found defendant Alex R. Valdez guilty of first degree murder. (Pen. Code, § 187, subd. (a).) It also found true the special circumstance allegation of killing a witness to a crime to prevent her from testifying (Pen. Code, § 190.2, subd. (a)(10)) and that the principal was armed with a firearm (Pen. Code, § 12022, subd. (a)(1)). It was further alleged, and Valdez admitted, that he had served three prior prison terms. (Pen. Code, § 667.5, subd. (b).) Valdez was sentenced to a prison term of life without the possibility of parole, plus six years. Substantial evidence supports the conviction, and the there was no evidentiary or instructional error. We affirm the judgment but modify the sentence as to the enhancements only to reflect primarily a recent amendment to Penal Code section 667.5, subdivision (b).

### *FACTS AND PROCEDURAL HISTORY*

The body of Kimberly Harvill was found in a remote, desolate area just above a dead-end road that spurs off Gorman Post Road near Highway 138. She was lying in a pool of blood with two bullet wounds to the base of the neck and one in her shoulder. Found under her was a fired .380 auto caliber cartridge case.

The prosecution's theory was that Valdez gave a firearm to his close friend, Josh Robertson, to murder Harvill because she was a witness to a shooting, and it was thought she was going to "snitch" on them to the police. The only issue was whether Valdez had intent to kill. Valdez was charged by information with one count of first degree murder with a witness-murder special circumstance allegation.

## I.    The Fresno Shooting

The prosecution first called Zachary Dotson.  He met Josh Robertson, Britney Humphrey (who was Robertson's girlfriend and Harvill's half sister), and Harvill and her children, on an August morning in 2016 at a gas station in Gorman.  Dotson had crashed his motorcycle along Interstate 5, and they agreed to give him a ride to Los Angeles.  Expecting to travel to Los Angeles the following day, he rented everyone a motel room in Gorman.  But then Robertson said he first wanted to travel to Fresno to pick up his son, so they all went north.

After dropping off Harvill's children at a relative's house, they picked up Valdez.  Robertson then drove everyone to an apartment at the Knights Inn in Fresno.  While Dotson stayed in the vehicle, the rest of them walked up to the front door of the apartment and started "smacking" the door.  Dotson did not hear what they were saying, but a window curtain moved and a female in the apartment said to " 'get the F out of my freaking doorway,' " and closed the curtain.  He had no idea why they were there; he had only heard some "crosstalk" that whoever was in the apartment had Harvill's children's Social Security cards and other personal property of hers.

Dotson saw Robertson and Valdez standing next to each other.  Immediately after the curtain closed, Robertson turned to Valdez and said, " 'Give me the gun.' "  Valdez "pulled the pistol out of his waistband and gave it to [him]."  Robertson, still banging on the door, took the weapon, "smacked the glass door and then shot through it where the lady's head was."  It all took about 10 to 15 seconds.  Dotson thought it was all "crazy."  Everyone then ran back to the vehicle and drove back to Valdez's

residence.  Robertson and Valdez went off into a room together but he could not hear what they were talking about.  About 10 minutes later, they left Valdez's residence to pick up Harvill's children and drive back to Gorman.  Dotson said he had no idea why Robertson had fired the gun.  He left the following day for Los Angeles with someone else.

The prosecution then called Britney Humphrey, Harvill's half sister.  She testified that she had a conversation with Robertson about going to Fresno "to get my sister's things back," and that if they did not get them "they were going to beat up whoever was in the room."  Harvill drove, and she dropped off the children at a relative's house in Fresno.  They then went to Valdez's house.  Humphrey only knew him by his nickname "A-1," but knew Robertson called Valdez his "homie."  After going into the house, Robertson and Valdez went into a bedroom for about 10 minutes.  She does not know what they talked about.  When they came out, Valdez joined everyone in the vehicle.

Harvill drove to the Knights Inn and parked in front of the apartment.  Robertson and Valdez "went on the side of the wall" to conceal themselves; she and Harvill went to the front door; Dotson remained in the truck.  Harvill first knocked but when there was no response she started banging on the door.  A woman cracked open the door and then shut it again.  Valdez "pulled a gun out of his waistband, and [Robertson] grabbed it from him." Robertson tried to force open the door, but then he just shot at the door where the woman had been standing.  Everybody started running; they jumped back into the truck and returned to Valdez's house.  Robertson and Valdez went into the backyard for about 10 minutes but she could not hear what they said.  When Robertson returned, they picked up the children and returned to

4

Gorman.  Dotson left later that night to return to Los Angeles with someone else.

Humphrey said that Harvill was distraught and panicking because the woman was shot.  She "wanted to turn herself in." Robertson, who was about 20 to 30 feet away from them during this conversation, did not seem to react.  But later, he became very upset about it.  Robertson said he wanted to return to Fresno; they had brought his son with them and he wanted to take him back.

## II.    The Second Trip to Fresno, and the Murder

Humphrey testified that she, Robertson, and Robertson's son left for Fresno while Harvill stayed behind in the motel. They dropped off the child with his grandmother and then went to Valdez's business.  Robertson went into the business for a couple of minutes and then emerged with Valdez.  The two of them talked for a few more minutes away from the truck and she did not know what they said.  When Robertson returned to the vehicle they drove back to Gorman.

As soon as they arrived in Gorman, Robertson told her he wanted to talk to Harvill.  Humphrey woke her up and relayed the message.  Harvill went outside while Humphrey continued to pack, and sometime later Harvill and Robertson left.  When Robertson came back about an hour later, he told Humphrey that he had "blasted" her sister and threatened Humphrey.  He pulled out the gun, which looked like the one he had used at the Knights Inn, and said he killed Harvill, " 'Cause they thought—he thought she was going to snitch."  It was the first time she heard him say "he thought she was going to tell on him and A-1."

5

It was undisputed that the gun used to kill Harvill was Valdez's gun. The following stipulation was read to the jury: "A fired .380 auto caliber cartridge case marked as item number 8 was recovered from the Gorman Post Road by victim Kim Harvill's body. [¶] A fired .380 auto caliber cartridge case was recovered by Fresno Police Department in an open parking stall directly in front of Michelle Madewell's motel's room front door at the Knights Inn in Fresno, California on August 12, 2016, marked number 20. [¶] LASD criminalist Philip Terramoto from the firearms identification section examined these two fired .380 auto caliber cartridge cases and identified both of them as having been fired from the same firearm." It was further stipulated that the two bullets recovered from Harvill's body "were determined to be most consistent with bullets commonly loaded in .380 auto caliber cartridges."

## III. The Police Interview with the Defendant

On March 26, 2017, and after *Mirandizing* him, Sergeant Perry of the Los Angeles Sheriff's Department, interviewed Valdez.

According to Perry, Valdez admitted that Robertson and Harvill were involved in the Knights Inn shooting. Valdez "brought the gun" and "gave it to" Robertson at the scene. He took the gun back after they returned to his house. Valdez related that a couple of days later Robertson called him and was fearful Harvill was going to turn herself in and tell on them. Robertson was considering killing her to silence her. He went up to Fresno a few days later and met with Valdez at his business. Robertson repeatedly said he was going to kill Harvill. Valdez

said he gave him the same firearm used at the Knights Inn shooting so "Robertson could kill" Harvill.

The recorded interview, marked as Exhibit 13A, was played for the jury.

At the beginning of the interview, Valdez was asked about his gang affiliation. He admitted he was a member of Northside Pleasant, Diamond Crips, also known as Six Deuce, and had been in gangs since he was 13 or 14. He said they call him "A-1," he had been involved in street crimes, and had been sent "to the joint" a couple of times. He has known Robertson since he was a little kid; he is also from Diamonds and is known as "White Boy." At one time, they were codefendants and both did time "for gun possession." Later in the interview, he explained he has the gun at his business because he is an active gang member in Fresno and needed it for protection from his enemies.

Valdez said Robertson and the others came to his house shortly before the Knights Inn incident to buy drugs and he gave them some methamphetamine. Then, Robertson said he needed to talk. "So, we go back downstairs to the basement and we start talking and he was talking about the Knights Inn. He was saying that somebody at the Knights Inn had all his stuff and they didn't want to give it back to him." He wanted Valdez as "backup" because "it's a bunch of dudes over there." He had known Valdez all his life and knew he had a gun. "And [Robertson's] like you should probably bring it because there's going to be probably be some peckerwoods over there or something." Valdez then told Perry, "I had a gun. I gave the gun to him." He added, "I told him just in case anything else happens, like if they got guns or anything, here you go to handle your business." He explained that, "well, he told me he was just

7

going to—he was just going to scare her.  So, I wasn't thinking he was going to shoot."  When the woman in the unit would not turn over anything, he thought it was over.  "I turn around.  I'm about to start walking back to the car.  [¶]  When I started walking back to the car, all I heard is pop, pop.  Two shots."  He sees Robertson waving a gun and Valdez calls him a "dumb ass."  And then, "I told everybody, man, let's get in the car.  Let's get out of here because two shots just went off and heck of people out here and the police are going to come any minute now."

Valdez then said that a couple of days later, Robertson calls.  Harvill was panicking, "[s]aying that she can't go to jail."  Robertson said that they "put a warrant out for her arrest or something because the girl at the motel had got shot."  Valdez said he was "talking crazy.  Talking about doing something to the girl."  When Robertson asked whether he should take her out, Valdez told him that was "[his] decision."  Robertson then said that "she's going to tell on everybody."

Later, Robertson drove up to Fresno to Valdez's business to talk.  Valdez said, "He's crying to me.  He [doesn't] know what to do."  Robertson keeps asking for the gun because, " 'I feel like the girl's going to tell on me.  She going to—I can't go do life.  I can't go do 15 years . . . .' "  Valdez said he was "basically, just saying that he wants to knock her down," kill her.  Robertson then tells him that he and Humphrey, his girlfriend, Harvill's half sister, had "been talking about it," and "they're both willing to do it and they just need the gun."  Valdez then said, "So, I give him the gun."  It is the same gun he had given Robertson for the Knights Inn shooting.  Valdez said the gun was a .380 and he had loaded it.  When asked what he thought his role in the murder was, he

8

said, "just because I gave him the gun. . . .  [¶]  But I talked—tried to talk him out of it."

## *DISCUSSION*

### I

### A.    Admission of Limited Gang Evidence

Valdez argues he was denied effective assistance of counsel when trial counsel did not oppose the introduction of highly inflammatory and prejudicial gang evidence even though there was no gang allegation.  We disagree.

Prior to trial, Valdez moved to exclude his entire interview with Sergeant Perry.  The motion was denied.[1]  The prosecution asked for a hearing on the admissibility of evidence that Valdez and Robertson were gang members, claiming it would show a close relationship between Robertson and Valdez "which goes towards the circumstances surrounding the defendant giving Robertson the gun and having specific intent to kill someone."  To be admissible, gang evidence must be relevant to a material issue in the case and may not be introduced "only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.  [Citations.]' "  (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)  Its introduction is especially problematic where, as here, there was no Penal Code section 186.22 gang enhancement allegation, and there was no suggestion the crime was related to gang activity.  The trial court stated it would not allow the introduction of gang evidence because evidence they hang out together and have committed other crimes with each other would

---

[1]    There is no claim this ruling was in error.

9

be coming out in other testimony, and "that makes the admission of the gang evidence less probative" and potentially "prejudicial."

The court then turned from general gang evidence to specific statements in the police interview where Valdez admitted his gang membership. When asked if the defense was moving to keep out those statements, counsel said, "No, I'm not." He explained that "they are going to introduce the entire statement, and that is exactly what I want, the good, bad and ugly. Because I think if we start to redact his statement, it's going to look, kind of, fishy." Counsel was also concerned that the other statements that were going to come out might need to be contextualized so the jury would not speculate there was something more "nefarious." Defense counsel then pointed out that Valdez had visible tattoos, which the court described as "visible on his face at the corner of his eyes, tattoos that are typical for anyone who is familiar with gang tattoos that are consistent with tattoos in their placement of what a gang member would have done to their face . . . ." The trial court decided not to redact the interview statement, noting that this was a tactical decision by counsel.

The court then crafted a limiting instruction: "You may consider evidence of gang membership and activity only for the limited purpose of evaluating the nature of the friendship between Joshua Robertson and Alex Valdez. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." After the parties agreed to the giving of that instruction, the court admonished the prosecution that while it could use the gang evidence to show they "know each other and how close their relationship may be," it could not argue "that gang members

10

share guns with one another or anything of that nature as to how gangs operate."

During closing, the prosecution argued that, "So when you start looking beyond the surface, beyond just Mr. Valdez's statement and what Mr. Valdez wanted the detectives to believe, you're going to discover who Mr. Valdez really is. And who is he? He says he's tight with Josh Robertson; he's really close. They were in a gang together. They commit crimes together. They grew up together. They have monikers that they refer to each other by together. [¶] . . . They are tied at the hip." Later in closing, the prosecution pointed out while Valdez said he was a "gangster" and needed a gun for protection, he brought the gun to work that morning and gave it to Robertson "because they both had a shared motive to kill [Harvill] and Robertson was going to do his dirty work again, which is what Robertson has done before in the past. And Robertson didn't have to beg and plead because they had agreed to it already."

Valdez does not argue the trial court erred by allowing in the unredacted police interview.[2] Rather, he asserts trial counsel was constitutionally ineffective for not objecting to the gang evidence in it. To establish this claim on direct appeal, Valdez must first show that counsel's performance fell below an objective standard of professional reasonableness, and second that prejudice flowed from trial counsel's performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) Where, as here, the

---

[2] Although this was a tactical choice by defense counsel, the trial court still considered the reasons given for the decision. We review its decision under the abuse of discretion standard. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) From our review of the record, we conclude there was no abuse of discretion.

challenge is made to trial counsel's tactical decision not to oppose the introduction of specific evidence, Valdez must demonstrate from the record that trial counsel had no rational tactical purpose for the choice or there could be no such purpose. (*People v. Pettie* (2017) 16 Cal.App.5th 23, 80.) We review trial counsel's decisionmaking in the context of the facts known and defer to counsel's reasonable tactical decisions because there is a strong presumption that the decisions are made within the broad scope of reasonable professional assistance. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 80–81, 86.)

Defense counsel was presented with a difficult choice. The only issue below was intent to kill. Counsel knew the police interview was going to come in, and it offered potentially exculpatory and inculpatory statements. One explanation Valdez gave for turning the gun over to Robertson was that he felt compelled to because of their close relationship. Another was that he could see any refusal would be futile because it was clear Robertson was not going to leave without the gun. Defense counsel could rationally conclude that Valdez's admission about gang membership could help explain why he did not have the intent to kill. He had told Robertson that whether to kill Harvill was "[his] decision," that he had "tried to talk him out of it," and that he was not worried about her going to the police because he had no significant exposure in the Fresno shooting as he was not the shooter. As defense counsel argued in closing, there was no intent because Valdez felt "pressure" by his close, personal relationship with Robertson to turn over the gun. It did not help that Valdez had visible gang tattoos; defense counsel could have rationally concluded that under the circumstances there was

12

unlikely any prejudice in including statements that contextualized that pressure.

Defense counsel also pointed out any redaction would look "fishy." Nothing in the record suggests how the videotaped interview could have been redacted to eliminate the reference to gangs. There was not just one discrete block; there were a couple of places in the interview where gangs were mentioned directly and indirectly. Without any indication in the record as to whether this videotape could have been redacted in a way that did not look "fishy," we cannot find that defense counsel's performance was constitutionally deficient. (*People v. Stewart* (2004) 33 Cal.4th 425, 483.)

Based on our review of the record in this direct appeal, we conclude Valdez has not established that defense counsel's performance was constitutionally deficient under an objective standard of professional reasonableness.

## B.    The "1101(b)" Evidence

The prosecution made a motion under Evidence Code section 1101, subdivision (b), to admit evidence of an uncharged threat Valdez allegedly made to a witness after a high-speed pursuit in Fresno in May 2014. According to the motion, Valdez and a woman by the name of Brittni Osha were passengers in a car being driven by Robertson. When the police tried to pull them over, Robertson took off at high speed. At one point, Robertson pulled a handgun from under the seat and handed it to Valdez who threw it out the window. When the car collided with something and stopped, Robertson and Valdez "threatened to kill" Osha "if she didn't run." Osha was later arrested and placed in the back seat of a police car. When Valdez was arrested, he

13

was placed in the back of the same vehicle while the police continued to look for Robertson.  Valdez then told Osha:  " 'You fucking ratted on us bitch, we're going to get you.' "

At the Evidence Code section 402 hearing, defense counsel argued, "The issue in this case is intent, intent to kill.  And this incident with a gun, it actually could work in our favor.  But I would prefer that it be excluded because it's a trial within a trial, whether it's true or not.  And I don't think that Mr. Valdez should have to prove his innocence . . . ."  The court found the evidence "to be highly probative.  You know, according to the proffer . . . both Mr. Valdez and Mr. Robertson threatened to kill her if she didn't run, and that Mr. Valdez believed she is a snitch, so I think it does go directly to the issue of intent to kill when someone or a particular female suspected to not assist in the crime or, perhaps, go to the police or not go along with their plan."  The court further found the evidence "to be more probative than prejudicial."

At trial, Osha told the same story but with some colorful additions.  She testified that during the chase Robertson and Valdez were throwing heroin and methamphetamine out the windows.  When Robertson gave Valdez a gun he threw that out the window, too; a second gun was also thrown out the window.  After Robertson crashed the car into a median they both told Osha "to run or else they would fucking kill [her]."  She ran across the street and, once they were gone, sat down.  On her arrest, she gave the police a description of Robertson and Valdez.  After she was placed in the back of the police vehicle, Valdez was put in with her.  "He was handcuffed.  He was, like, kicking his legs and trying to get out of the handcuffs, asked me if I had

14

ratted on them, and if I did, then he was going to kill me." She said Valdez was very angry and she was scared.

" 'Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328; *People v. Johnson* (2013) 221 Cal.App.4th 623, 635.) And, "the uncharged act must be relevant to prove a fact at issue [citation], and its admission must not be unduly prejudicial, confusing, or time consuming." (*People v. Leon* (2015) 61 Cal.4th 569, 597–598.) We review the trial court's decision under the abuse of discretion standard. (*Foster, supra,* at pp. 1328–1329.)

There was no abuse of discretion here. The facts of the uncharged and charged crimes were sufficiently similar. In each case, a female witness observed Valdez and Robertson commit a crime; in the uncharged crime he threatened the witness with physical violence if she had "ratted," and in the charged offense the witness was killed allegedly to keep her from becoming a "snitch." The evidence was being introduced to show a rational inference of the same intent, and the trial court's conclusion that the probative value of the evidence outweighed its prejudice is well supported. Valdez suggests the two incidents were too remote in time. But the uncharged threat occurred in 2014 and the killing occurred in 2016.

## II

### Substantial Evidence Supports the Verdict

Valdez asserts there is no substantial evidence in the record to support the conviction or the special circumstance true

15

finding. "Upon a challenge to the sufficiency of evidence for a jury finding, ' " ' "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 323–324.)

Valdez was alleged to be an aider and abettor. "To be guilty as an aider and abettor, a person must have knowledge of the direct perpetrator's unlawful purpose; have the intent or purpose of committing, encouraging, or facilitating the commission of the direct perpetrator's offense; and by act or advice aid, promote, encourage, or instigate the commission of that offense." (*In re White* (2020) 9 Cal.5th 455, 464, citing *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) Here, there was evidence from which a reasonable jury could conclude Valdez knew what Robertson intended to do and that he gave him the gun so Harvill could be silenced. Harvill witnessed the shooting at the Knights Inn in Fresno and Robertson and Valdez knew that if she went to the police, she could identify them as being involved. When she indicated she wanted to go to the police, Robertson went to Valdez and told him that he and Harvill's half sister were ready to kill Harvill to silence her. Valdez gave Robertson the gun knowing that was his intent and that the killing would benefit both of them. That evidence is sufficient to show intent to kill.

Substantial evidence also supports the witness-murder special circumstance finding. To establish the truth of that allegation, the evidence must show that, "[t]he victim was a witness to a crime who was intentionally killed for the purpose of

16

preventing his or her testimony in any criminal . . . proceeding, and the killing was not committed during the commission or attempted commission, of the crime to which he or she was a witness . . . ." (Pen. Code, § 190.2, subd. (a)(10).) Here, there was substantial evidence Robertson killed Harvill with Valdez's gun to keep her from talking to the police and implicating them in the Fresno shooting. Valdez admitted in the police interview that that was the reason Robertson needed the gun. The evidence is sufficient to establish the witness-murder special circumstance.

**III**

**There Was No Instructional Error**

**A.     Sua Sponte Duty to Instruct on Lesser Included**

Valdez complains the court had a sua sponte duty to instruct on a lesser included offense of involuntary manslaughter because there was evidence in the police interview that he had tried to talk Robertson out of killing Harvill. Involuntary manslaughter is a lesser included offense of murder (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145), and an instruction on a lesser included offense must be given "only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense." (*Thomas*, *supra*, at p. 813.) "An instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill." (*People v. Rogers* (2006) 39 Cal.4th 826, 884 (*Rogers*).)

However, we need not address the specifics of the argument here. Any error in failing to sua sponte instruct on involuntary

17

manslaughter was harmless. As the Supreme Court stated in a *Rogers*: "In addition to being fully instructed on first degree premeditated murder, the jury also was instructed on the lesser included offenses of implied malice second degree murder and heat-of-passion voluntary manslaughter, both of which require higher degrees of culpability than does the offense of involuntary manslaughter. The jury rejected the lesser options and found defendant guilty of first degree premeditated murder. Under the circumstances, there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option." (*Rogers*, *supra*, 39 Cal.4th at p. 884.)

The same is true here. The jury was instructed on both first and second degree murder. The jury found Valdez guilty of first degree murder. The mere fact Valdez told Robertson not to do anything stupid, or that any decision to kill was "his" decision, does not change the dynamics. Any error was harmless.

## B. CALCRIM No. 375 Was Properly Given

Valdez argues it was error to give CALCRIM No. 375 because it allowed the jury to use the evidence from an uncharged offense (i.e., the 2014 uncharged threat to Osha), which may be proved by preponderance of the evidence, to establish intent in the charged offense, which must be proved beyond a reasonable doubt. He asserts this is structural error because it lessened the prosecution's burden of proof.[3]

---

[3] The court read the following CALCRIM No. 375 instruction:

"The People presented evidence that defendant previously committed another offense or act.

18

Valdez recognizes that this structural error argument has been rejected by our high court: "We have explained before, however, that these different standards of proof are reconciled by the different purposes for which the evidence is used. When evidence of uncharged misconduct is admitted for the purpose of establishing identity or intent, we have explained that the crimes are mere 'evidentiary facts.' [Citation.] The jury cannot consider them at all unless they find them proven by a preponderance of

---

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the other prior offense or act. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the other prior offense or act, you may, but are not required to, consider the evidence for the limited purpose of deciding whether:

"The defendant acted with the specific intent to kill or acted with the specific intent required for the special circumstance of killing a witness in this case;

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the other prior offense or act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offense or that the charged special circumstance has been proved. The People must still prove each charge, special circumstance and allegation beyond a reasonable doubt."

19

the evidence. 'If the jury finds by a preponderance of the evidence that defendant committed the other crimes, the evidence is clearly relevant and may therefore be considered.' [Citation.] If the jury finds the facts sufficiently proven for consideration, it must still decide whether the facts are sufficient, taken with all the other evidence, to prove defendant's guilt beyond a reasonable doubt." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1259–1260.)[4] He further recognizes *Virgil*'s holding is binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Valdez attempts to draw a distinction between evidence in the guilt phase with a special circumstance allegation, such as here, which, he argues, goes to punishment. Relying on language in *People v. Medina* (1995) 11 Cal.4th 694 that holds the reasonable doubt standard applies "to evidence of 'other crimes' sought to be admitted as aggravating evidence at the penalty phase of trial" (*id.* at p. 763, italics omitted), he posits that, by "parity of reasoning," evidence of other uncharged crimes that support a special circumstance allegation must also be proved beyond a reasonable doubt. We are not persuaded. The evidence of the 2014 threat was introduced in the guilt phase of the trial, and *Virgil* is clear that at that point the other crimes are merely "evidentiary facts." Moreover, to establish the witness-murder special circumstance, the evidence must show the victim witness was intentionally killed "for the purpose of preventing his or her testimony" in any criminal proceeding. (Pen. Code, § 190.2, subd. (a)(10).) Because the purpose of this other crime evidence is to show that intent, it is still an "evidentiary fact" even though it

___

[4]      *Virgil* dealt with CALJIC Nos. 2.50, 2.50.1, and 2.50.2, the precursors to CALCRIM No. 375.

20

goes to the special circumstances allegation and the holding in *Virgil* controls.[5]

## IV

### Sentencing Issues

#### A. Prior Prison Term Enhancements

The trial court imposed three, one-year prior prison term enhancements. (Pen. Code, § 667.5, subd. (b).) The prison terms were for infliction of corporal injury and possession of a firearm by a felon. At the time of sentencing, those enhancements were properly imposed.

However, effective January 1, 2020, Penal Code section 667.5, subdivision (b) was amended to provide that prior prison term enhancements applied only to those terms served for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b). The 2020 amendment applies retroactively to all pending cases, even those on appeal. (*People v. Winn* (2020) 44 Cal.App.5th 859, 872–873.) Because Valdez's prior prison terms do not qualify under the amended statute, they must be stricken.

#### B. Armed Firearm Enhancement

The court imposed a three-year enhancement under Penal Code section 12022, subdivision (a)(1). Valdez argues that

---

[5] Valdez argues we should follow *People v. Nicolas* (2017) 8 Cal.App.5th 1165, where the giving of CALCRIM No. 375 was found to be error. But there the court declared there was clear error because "there were, in fact, no uncharged acts admitted into evidence." (*Id.* at p. 1178.)

21

section only allows for a one-year enhancement and requests the sentence be modified accordingly.

Prior to trial, the information was amended to include an enhancement allegation under subdivision (a)(1) of section 12022, that the principal was armed with a firearm. The jury found the allegation true, and the court sentenced Valdez to an additional term of *three years*. But subdivision (a)(1) provides in relevant part that, "Except as provided in subdivisions (c) and (d), a person who is armed with a firearm in the commission of a felony . . . shall be punished by an additional and consecutive term of imprisonment pursuant to subdivision (h) of Section 1170 for *one year* . . . ." (Italics added.)

The Attorney General argues that the three-year enhancement was proper under subdivision (d) of Penal Code section 12022. But the enhancement was not alleged under subdivision (d), the true finding was not under subdivision (d), and subdivision (d) is on its face inapplicable. That subdivision only applies to "commission of an offense or attempted offense specified in subdivision (c)," which are drug offenses. The charged offenses here did not involve drugs. The court should only have imposed a one-year enhancement.

### *DISPOSITION*

The judgment is affirmed; however, the sentence is modified to strike the prior prison term enhancements and to modify the firearm enhancement to one year. Upon remand, the clerk of the superior court is directed to modify the abstract of judgment accordingly and to send a copy to the Department of Corrections and Rehabilitation.

SALTER, J.*

We Concur:

GRIMES, Acting P. J.

STRATTON, J.

---

* Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.