Filed 8/30/24  P. v. Yancy CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMEL YANCY,<br><br>    Defendant and Appellant. | D081382<br><br><br>(Super. Ct. No. SCE403243) |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed in part, reversed in part.

Denise M. Rudasill, under appointment by the Court of Appeal,  for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Laura G. Baggett and Robin Urbanski, Deputy Attorneys General for Plaintiff and Respondent.


Jamel Yancy and another man entered the apartment of a woman Yancy knew and robbed her at gunpoint, taking an Xbox video-gaming

system. Sometime after the robbery, Yancy was spotted by police while he was driving and officers initiated a traffic stop. Yancy, however, evaded the officers after leading them on a high-speed chase. When Yancy was eventually arrested, police discovered photographs and videos on his phone showing him in possession of various guns. Yancy was brought to trial, and a jury convicted him of robbery, evading law enforcement while driving recklessly, and 15 counts of being a felon in possession of a firearm. The jury acquitted Yancy of two additional counts of being a felon in possession of a firearm.

On appeal from the judgment of conviction, Yancy argues the trial court erred by (1) consolidating the robbery case with the separate felon in possession case related to the images on his phone and (2) by admitting evidence concerning his involvement with a gang, child protective services, human trafficking, and illicit drug sales. In addition, he asserts insufficient evidence supports several of the felon in possession of a firearm convictions. As we shall explain, we reject the majority of Yancy's appellate contentions, with the exception of his assertion that insufficient evidence supported one of the felon in possession of a firearm charges. Accordingly, that conviction, count 14, is reversed and the judgment is otherwise affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

The victim of the robbery, P.R., testified that she met Yancy about a month before the robbery as she was walking near her home.[1] She and Yancy hung out a couple of times and had a sexual relationship. On the

_____

[1] P.R. was in custody when she testified at Yancy's trial. The court informed the jury of this fact and instructed that it was not to consider or speculate about. In addition, she was compelled to testify, and did so pursuant to a grant of immunity by the court.

night of the robbery, October 9, 2020, P.R. was on the phone with her boyfriend when she heard banging on her door. She went to see who it was and opened the door, but not the outer screen door. She heard Yancy, who was with codefendant Jeandor Dormevil, say "open up the door." P.R. was surprised to see them.

When P.R. opened the door, Yancy and Dormevil barged in, and Yancy began looking around the apartment. Yancy asked if anyone was there and appeared to be in a rush. Both men were armed with guns. Yancy looked in P.R.'s living room, bathroom, and bedroom. P.R. angrily asked Yancy what he was doing, and Yancy said that "if you're not going to be my bitch, it's going to be bad for you." Yancy then grabbed P.R.'s Xbox and unhooked it from her television over P.R.'s demands not to touch her things.

After the men left P.R.'s apartment with her Xbox, P.R. used her phone to film them driving away and called 911. She told the 911 operator the men were armed with guns and one had tried to hit her with his weapon. She also said she knew Yancy and the two men seemed like they were high on cocaine. Police arrived while P.R. was still on the phone with the 911 operator.

A body-worn camera of one of the responding police officers recorded his interview of P.R. She told the officers that she knew Yancy, but at first downplayed their relationship. She then showed officers a video of Yancy on her phone suggesting she and Yancy had a sexual relationship and that she had known him for months. P.R. explained to the officers that she had let the two men into her apartment, that they were both armed, and that they had threatened her with their guns when she tried to stop them from taking her television by picking up a knife from her kitchen.

After the police left, P.R. Facetimed Yancy and told him to return the Xbox. P.R. recorded the Facetime call, and in the video Yancy is seen with

3

two firearms. At the time of trial, P.R. testified that she could not remember if the guns in the video were the same ones that Yancy and Dormevil used in the robbery.

After the robbery, P.R. texted Yancy and asked him when he was going to return her Xbox. In the weeks after the robbery, P.R. continued to have contact with Yancy. She told the jury that she was talking to him because she wanted him to return the gaming system. At one point, P.R. offered Yancy $2,000 and marijuana in exchange for the Xbox. She also testified she had sex with Yancy after the robbery because she thought he was going to return the Xbox and she "felt … some type of way about him." Sometime thereafter, a woman that P.R. believed was Yancy's sister, called P.R. and told her that if P.R. dropped the charges, the Xbox would be returned to her. P.R. told the woman she would drop the charges, but testified that she only made that statement to get her Xbox back. On November 24, 2020, after Yancy had been taken into police custody, three men P.R. did not know returned the Xbox to her.

On October 29, 2020, a San Diego police officer was on patrol when he observed a black SUV driven by Yancy. The officer identified Yancy; the window of the SUV was down and the officer testified that Yancy stared directly at him with an "angry face." The officer knew Yancy was wanted for a home-invasion robbery, so he made a U-turn to get behind Yancy to initiate a stop. Yancy pulled into a nearby parking lot, made eye contact with the officer through his rear view mirror, and began rummaging through his center console.

The officer then turned on his lights and siren. Yancy slowed down, but then "aggressively" sped through the parking lot and back onto the street. Yancy then ran a red light, swerved, and fishtailed as he increased his speed

4

to about 50 miles per hour in a 30 mile per hour zone, and drove through a four-way stop at more than 70 miles per hour. Law enforcement officers lost sight of him.

Yancy was eventually arrested on November 17, 2020 when law enforcement officers were investigating illicit fentanyl activity at a home where Yancy's girlfriend was living. At the time of his arrest, Yancy was holding a cellphone that he admitted was his. The phone contained numerous photographs and videos of guns and of Yancy holding guns. In addition, three guns were seized from the home where Yancy was arrested after officers served a search warrant there. Testing of the DNA collected from the three guns showed that Yancy handled the weapons.

B. *Defense Case*

Dormevil testified in his own defense. On the stand he claimed that P.R. let him and Yancy inside of her apartment, they asked P.R. if they could borrow the Xbox, and she gave them permission to take it. Dormevil also testified that he and Yancy were unarmed and had no intention to rob P.R.

Yancy did not present any affirmative evidence in his defense. During closing argument, his trial counsel did not dispute the firearm charges that were proven by DNA evidence. His counsel, however, questioned the authenticity of the guns depicted in the photographs that supported some of the felon in possession charges. Yancy's counsel also argued that P.R. was not a credible witness based on the inconsistencies in her testimony and her statements to law enforcement.

C. *Verdict and Sentencing*

Yancy and Dormevil were charged together in one information. Both were charged with home-invasion robbery (Pen. Code, §§ 211, 212.5,

5

subd. (a)$^2$; count 1) and first-degree burglary (§§ 459, 460; count 2). As to each of those offenses, the information also alleged both men personally used a firearm (§§ 12022.53, subd. (b); 12022.5, subd. (a)). Yancy was also charged with three counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1); counts 3–5) and evading an officer while driving recklessly (Veh. Code, § 2800.2, subd. (a); count 6).

The district attorney filed an amended consolidated information before trial containing the same charges as the original information, and adding 15 additional counts against Yancy for felon in possession of a firearm (§ 29800, subd. (a)(1); counts 5-21). The amended consolidated information also included counts against Yancy for animal cruelty and animal abuse and neglect; the trial court denied the prosecution's motion to try these two charges with the others.[3]

At the conclusion of trial, the jury found Yancy not guilty of residential burglary as alleged in count 2 and being a felon in possession of a firearm as alleged in counts 5 and 9, but otherwise convicted him as charged.[4] Thereafter, the trial court sentenced Yancy to 14 years and four months in state prison.

Yancy filed a timely notice of appeal from the judgment.

---

[2]     Subsequent undesignated statutory references are to the Penal Code.

[3]     The amended consolidated information also charged Dormevil with three additional charges of unlawful weapon and ammunitions possession (§§ 30305, subd. (a)(1), 29800, subd. (a); counts 22–24).

[4]     Dormevil was tried jointly with Yancy. The jury found Dormevil not guilty of robbery and burglary, but guilty of the firearms and ammunition charges.

DISCUSSION

I

Yancy first asserts that the court committed prejudicial error by joining the robbery and burglary charges with the charges for felon in possession of a firearm. The Attorney General responds that there was no error because the crimes at issue "were of the same class, and the potential prejudice from consolidation was substantially outweighed by the practical benefits."

A

*Additional Background*

In his trial brief, the prosecutor requested to consolidate the defendants' robbery and burglary case, which also included three charges for felon in possession against Yancy and the charge for evading arrest (Case No. SCE403243/MBV510), with two additional cases. The second case charged Yancy with 15 additional counts of felon in possession of a firearm, animal abuse and animal cruelty (Case No. SCE404491/MBV593), and the third charged Dormevil with two additional counts of felon in possession of a firearm and one count of unlawful possession of ammunition (Case No. SCE406974/MBW850). Dormevil's counsel filed a written opposition requesting the cases be severed, and the trial court presumed that Yancy joined that motion.

At the hearing on the consolidation request, the prosecutor argued that evidence would be cross-admissible between the robbery/burglary and felon in possession cases because evidence seized from Yancy's phone was important in both cases. Additionally, the prosecutor anticipated that the defendants would argue in the robbery case that there was no proof the firearms used were real. Thus, he contended, the photo and video evidence from the cell phone depicting Yancy with firearms clearly loaded with ammunition was

relevant to prove that he used a real weapon in the robbery. The prosecutor further asserted the crimes alleged in both cases were of the same class, and there was nothing unduly prejudicial about either case warranting severance.

Dormevil's counsel argued the crime of being a felon in possession of a firearm was not in the same class of assaultive crimes as robbery and residential burglary, and that evidence of the robbery and residential burglary would not be admissible in a separate trial on the felon in possession charges. Yancy's counsel asserted that prejudice would result from consolidation, particularly in light of P.R.'s inconsistent statements about the robbery. Yancy's counsel also argued the prosecution should not be permitted to bolster its weak robbery evidence with the relatively stronger case that he unlawfully possessed firearms.

In response to the defense arguments, the prosecutor reiterated that the charges were all of the same class. He also explained that all of the charges arose out of the same investigation, but they were not filed in a single complaint due to a "procedural hiccup" caused by the pandemic. In terms of the probative value and cross-admissibility of the evidence, the prosecutor stated that the defendants' relationship to each other was a critical part of the theory of the case. He stated that the evidence from Yancy's cell phone suggested they were involved in trafficking weapons together and suggested that they were robbing P.R. "because she's selling drugs for them and she didn't cover whatever she owed, or she's not working the blade as a human trafficking victim, or she's taking something and they're holding the Xbox hostage."

The court granted the prosecutor's motion to consolidate the weapons cases with the robbery/burglary case. The court found all of the crimes were within the same class of crimes, and that the evidence could be presented in a

8

manner that was not unduly prejudicial to the defendants.  The court noted it was "hopeful that [the parties could] tailor presentation of evidence as to the felon in possession counts in such a way that the jury will be simply called upon to determine whether or not these are, in fact, real guns."

B

*Legal Standards*

" 'The law prefers consolidation of charges.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 574.)  "[J]oint trial has long been prescribed—and broadly allowed—by the Legislature's enactment of section 954.  The purpose underlying this statute is clear:  joint trial 'ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.]  'A unitary trial requires a single courtroom, judge, and court attach[és].  Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried.  In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process.' " (*People v. Soper* (2009) 45 Cal.4th 759, 771–772 (*Soper*).)

Charges may be consolidated under two circumstances:  (1) when they are connected together in their commission; or (2) when they are of the same class of crimes.  (§ 954.)  Offenses are of the same class of crimes or offenses if they "possess common characteristics or attributes." (*People v. Moore* (1986) 185 Cal.App.3d 1005, 1012.)  Offenses are connected in their commission if there is a common element of substantial importance in their commission, including the intent or motivation with which different acts are committed. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219.)  Whether the charges

9

are properly consolidated under section 954 is a question of law subject to independent review on appeal.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 188.)

　　If the charges are properly joined, "[t]o demonstrate that a denial of severance was reversible error, defendant must ' "clearly establish that there [was] a substantial danger of prejudice requiring that the charges be separately tried." ' [Citations.]  [¶] Refusal to sever charges on a defendant's motion *may* be an abuse of discretion where: ' "(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty." ' " (*People v. Smith* (2007) 40 Cal.4th 483, 510–511.)

　　"Unlike what occurs in situations involving the admissibility of uncharged misconduct—in which the People bear the burden of establishing that the evidence has substantial probative value that clearly outweighs its inherent prejudicial effect—[] in the context of properly joined offenses, '[t]he burden is reversed.' [Citations.]  In the *latter* setting, '[t]he … burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]  When the offenses are [properly] joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise.  …  That the evidence would otherwise be inadmissible [under Evidence Code section 352] may be considered as a factor suggesting possible prejudice, but countervailing considerations [of efficiency and judicial economy] that are not present when evidence of uncharged

10

offenses is offered must be weighed in ruling on a ... motion [to sever properly joined charges]. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.' " (*Soper, supra*, 45 Cal.4th at p. 773, italics omitted.)

Additionally, section 954.1 "provides that when, as here, properly joined charges are of the same class, the circumstance that evidence underlying those charges would not be cross-admissible at hypothetical separate trials is, *standing alone, insufficient* to establish that a trial court abused its discretion in failing to sever those charges. Accordingly, the assumed absence of cross-admissibility ... in the present case is simply one factor to be weighed against the benefits of joinder." (*Soper, supra*, 45 Cal.4th at pp. 779–780.)

"A trial court's denial of a motion to sever properly joined charged offenses amounts to a prejudicial abuse of discretion only if that ruling ' " ' " 'falls outside the bounds of reason.' " ' " ' " (*Soper, supra*, 45 Cal.4th at p. 774.)

C

*Analysis*

Yancy agrees the charges at issue against him were of the same class and thus properly joined under section 954. He argues, however, that the court abused its discretion by consolidating the 15 additional firearm charges with the initial charges brought against him. Specifically, he contends that evidence from the second case would not be admissible in the trial of the first case, except with respect to that case's felon in possession of a firearm charge,

11

because it would be excluded as improper propensity evidence under Evidence Code section 1101.[5]

Yancy also argues that the evidence concerning the later weapons charges would have been excluded in a separate trial of the robbery charges because there would be "a 'substantial likelihood the jury' ... would use the evidence from the possession of so many guns for the 'illegitimate purpose' of finding [him] guilty of the robbery." Yancy asserts the charges contained in the second-filed case were particularly inflammatory because of the large number of charges. Finally, he contends the two cases alone were both relatively weak, and thus joining them together likely altered the outcome to his detriment in both cases. We reject these arguments and agree with the Attorney General that Yancy has not shown the trial court abused its discretion by finding the significant benefits of trying the cases together outweighed the potential prejudice of one proceeding.

"When a trial court considering a defendant's motion for severance of unrelated counts has determined that the evidence of the joined offenses is not 'cross-admissible,' it must then assess the relative strength of the evidence as to each group of severable counts and weigh the potential impact

---

[5] Evidence Code section 1101, subdivision (a) requires the exclusion of evidence of a "person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) ... to prove his or her conduct on a specified occasion." Subdivision (b), however, permits "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ... ) other than his or her disposition to commit such an act." Evidence of an uncharged crime, therefore, is admissible as long as it is relevant to prove a fact such as motive, opportunity, intent, plan, or knowledge. (Evid. Code, § 1101, subd. (b); *People v. Davis* (2009) 46 Cal.4th 539, 602.)

of the jury's consideration of 'other crimes' evidence. I.e., the court must assess the likelihood that a jury not otherwise convinced beyond a reasonable doubt of the defendant's guilt of one or more of the charged offenses might permit the knowledge of the defendant's other criminal activity to tip the balance and convict him. [Citation.] If the court finds a likelihood that this may occur, severance should be granted." (*People v. Bean* (1988) 46 Cal.3d 919, 936.)

In this case, with respect to the cross-admissibility of the evidence, it is true the evidence relating to Yancy's possession of 18 guns at various times was probative of his character to own weapons generally, and thus potentially prejudicial. However, the evidence was not so inflammatory that it prevented the jury from assessing Yancy's guilt on the robbery charge. Specifically, the possession evidence consisted of photos and videos from Yancy's phone showing various weapons and their sale prices, as well as the DNA linking Yancy to the three weapons found at the house that was searched after his arrest. This evidence was simple and distinct from the evidence supporting the armed robbery conviction (and a relatively small part of the trial evidence), neutralizing any prejudicial effect. (See *Soper, supra*, 45 Cal.4th at p. 784 ["Appellate courts have found ' "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' "].)

With respect to the other factors—whether certain charges were unusually likely to inflame the jury and whether two weak cases were joined, or one weak case joined with a much stronger one—we also do not agree with Yancy that they show the court's decision to try the two cases together was an abuse of discretion. As the Attorney General points out, neither set of charges was particularly more inflammatory than the other. P.R. testified

13

that Yancy was armed when he entered her home and he used the gun to threaten her after she tried to get Yancy and Dormevil to leave her apartment. The fact that Yancy faced separate charges for firearm possession was consistent with his use of a firearm in the robbery. Neither case was more likely to inflame the jury than the other.

Likewise, the evidence supporting each case was not comparatively weak in relation to the other. The robbery was supported by P.R.'s direct accounts of the events at trial, and her statements to police and the 911 dispatch operator. Although those statements contained some inconsistencies about her relationship with Yancy, P.R. was consistent in her account of the robbery. Further, the defense effectively pointed out the problems with P.R.'s consistency and credibility. The felon in possession of firearm charges also faced weakness since not all of the photographic evidence showed Yancy with the firearms. Neither case was so overwhelmingly strong that it could influence the jury's perception of the other.[6]

On the other side of the balancing test, the benefits of joining the cases were significant. Instead of separate trials, Yancy's case required a single courtroom, judge, jury panel, and appeal. These benefits outweigh any potential prejudice that resulted from trying the cases together. (See *Soper, supra*, 45 Cal.4th at pp. 771–772.) Accordingly, we reject Yancy's assertion that the court abused its discretion by allowing a joint trial of the charges against him.

Although we find the trial court's decision to allow a joint trial was proper at the time it was made, "[b]ecause the issue is raised on appeal

---

[6]    The fourth factor, whether one of the charges is a capital offense, is not relevant here.

14

following trial" and Yancy asserts he was denied a fair trial by the denial of his severance motion "we must also consider whether 'despite the correctness of the trial court's ruling, a gross unfairness has occurred from joinder such as to deprive the defendant of a fair trial or due process of law.'" (*People v. Sandoval* (1992) 4 Cal.4th 155, 174.)  In this regard, Yancy has not demonstrated any actual prejudice from any "spillover" effect of the joinder of the charges for trial.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 (*Bradford*).)

As noted, the evidence regarding the robbery was distinct from that regarding the 15 additional charges of felon in possession of a firearm.  In addition, the court instructed the jury with CALCRIM No. 3515 that "[e]ach of the counts charged in this case is a separate crime.  You must consider each count separately and return a separate verdict for each count."  Further, the jury's acquittal on the burglary charge and two of the firearm offenses shows it independently evaluated the evidence on each count and was not unduly inflamed.  Yancy has not demonstrated that prejudice actually resulted from joinder of the charges at trial.  (*Bradford, supra*, 15 Cal.4th at p. 1318.)  Thus, we conclude that Yancy has not met the "high burden of establishing that the trial was grossly unfair and that he was denied due process of law." (*Soper, supra*, 45 Cal.4th at p. 783.)

II

Yancy next contends that the trial court abused its discretion by allowing witness testimony that he "was selling drugs, was a gang member, was pimping women out, and had his child taken by [Child Protective Services] for endangerment."  He argues the evidence was highly inflammatory and more prejudicial than probative, and thus should have been excluded under Evidence Code sections 352 and 1101.  The Attorney

15

General responds that all of the evidence that Yancy identifies was properly admitted, that Yancy forfeited his challenge to some of the evidence by failing to object at trial, and that even if the evidence was improperly admitted, any error was harmless.

A

*Legal Standards*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, … having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character … is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident …) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Under Evidence Code section 352, a trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Reviewing courts will not disturb a trial court's admission of evidence " 'over an Evidence Code section 352 objection … unless

16

the trial court's decision exceeds the bounds of reason.'" (*People v. Montes* (2014) 58 Cal.4th 809, 859 (*Montes*).)

B

*Gang Evidence*

Yancy argues that certain statements made by P.R. and the prosecution's gang expert, San Diego Sheriff's Department Detective Troy Conrad, about Yancy's gang affiliation were improperly admitted. Specifically, he challenges: (1) Conrad's testimony that Yancy was a member of the Emerald Hills street gang and was known by the moniker "Baby Joe 90Z"; (2) Conrad's statement about, and images from, Yancy's phone showing his gang moniker; (3) Conrad's explanation of the meaning of gang lingo Yancy used in several jail calls to Dormevil; (4) Conrad's statement that no gang offense was alleged against Yancy in this case; and (4) P.R.'s statement to the officers responding to her 911 call, introduced through an officer's body-worn camera footage, that Yancy was a "gang banger."

1. *Additional Background*

During a pretrial conference, in which the parties were discussing the admissibility of phone calls between Yancy, who was in jail at the time, and Dormevil, Dormevil's counsel noted that he anticipated the prosecutor would call a gang expert to explain the slang words used in the calls. Dormevil's counsel objected that no one should explain what the defendants were saying; rather, the calls should stand for themselves. The prosecutor responded that he did plan to call a gang expert to interpret the words used on the jail calls because it was necessary for the jury's understanding of those conversations, but the prosecutor assured the court that it was not his intention to "parade" gang evidence in front of the jury. The parties then agreed to conduct an

17

Evidence Code section 402 hearing on the gang expert's experience and qualifications to explain the language used in the jail calls.

The parties also discussed the fact that P.R. would likely testify that she knew Yancy was a gang member and that she had seen his gang tattoos, which are visible in the pictures of Yancy from his social media account, and that this information formed part of the basis for her identification of Yancy as one of the two men who robbed her. Yancy's counsel wanted to ensure that the testimony was limited, and alternatively offered to stipulate to the fact that Yancy was a gang member. At that juncture, the court stated that it did not think a stipulation was necessary, and that it might "cause greater harm than it would be intended to achieve." The court ruled that the evidence could "come in for a very limited purpose" of explaining to the jury the meaning of the jail calls and the tattoos in the photos.

Following the Evidence Code section 402 hearing at which Conrad testified, defense counsel stated, "I just want to be sure that, based on the filings of the People that I understand those purposes, which are to explain the jail calls and that he identified himself as Emerald Hills to [P.R.]. And outside that, there's not going to be a discussion of any gang stuff." The prosecutor clarified that he would also use the detective for "laying the foundation for all [of Yancy's] social media," including that he labeled himself by his gang moniker on social media posts and the victim used his gang moniker as his contact information in her phone, as well as to explain his gang tattoos.

The prosecutor argued that some basic explanation was necessary to provide the jury with context for things discussed between the victim and the responding officers, which the jury would see and hear through body-worn camera footage. Defense counsel responded that the way Yancy was labeled

18

in P.R.'s phone and whether that label was a gang moniker was irrelevant and unduly prejudicial. The court ultimately ruled that it would allow the expert testimony about Yancy's gang moniker.

At trial, Conrad testified that P.R. knew Yancy was affiliated with the Emerald Hills criminal street gang, and that Yancy was known by the gang moniker "Baby Joe 90Z." Conrad also testified that some of the photos on Yancy's social media postings contained that moniker. Conrad explained the meaning of words used during the jail calls between Yancy and Dormevil, including that "blood" referred to a blood set of the Emerald Hills gang, explained that members of a blood set gang would typically replace the letter "c" at the start of words with the letter "b," and explained some of the other slang words used in the calls. Conrad also stated during cross-examination that no gang offense was alleged in the case. Finally, the jury was shown video recorded on an officer's body-worn camera of P.R. stating that Yancy was a "gang banger" with the Emerald Hills gang.

2. *Analysis*

As an initial matter, Yancy's trial counsel agreed that Conrad's testimony explaining the jail calls and P.R.'s identification of Yancy as an Emerald Hills gang member on the body-worn camera footage was relevant and admissible. Accordingly, Yancy's challenge to this evidence as improperly admitted under Evidence Code section 352 is forfeited. (See Evid. Code, § 353; *People v. Clark* (1992) 3 Cal.4th 41, 125–126 ["In the absence of a timely and specific objection on the ground sought to be urged on appeal, the trial court's rulings on admissibility of evidence will not be reviewed."].) Thus, the only portion of Yancy's claim that is reviewable is his challenge to Conrad's testimony explaining Yancy's gang moniker and its presence on his social media posts.

19

But even if Yancy had preserved the entirety of his claim, it nevertheless fails because the trial court's admissibility rulings were not an abuse of discretion. First, any prejudice stemming from the minimal gang evidence was not so substantial as to outweigh its probative value. The testimony was relevant because it explained the photographic and video evidence that supported the charges for felon in possession of a firearm, specifically the images showing Yancy holding the guns that formed the basis for those charges, and the testimony explained the incriminating jail phone calls between Yancy and Dormevil about the Xbox. The testimony also helped explain P.R.'s inconsistent testimony, which the prosecution asserted was colored by her fear of gang retaliation.

Moreover, and as Yancy's trial counsel agreed, the minimal testimony was admissible because it was part and parcel of P.R.'s identification of Yancy as the person who robbed her. In addition, and importantly, Conrad's testimony on the subject of Yancy's gang affiliation was relatively brief and did not suggest the crimes in the case were gang related. Under the circumstances, the trial court did not exceed the bounds of reason or otherwise abuse its discretion in admitting the minimal gang evidence Yancy now challenges.[7]

---

[7] Yancy contends that his case is similar to *People v. Avitia* (2005) 127 Cal.App.4th 185 (*Avitia*), which reversed a conviction for grossly negligent discharge of a firearm based on the admission of evidence suggesting the defendant was a gang member. Unlike *Avitia*, in which the prosecution's case was far weaker without the evidence of the defendant's gang involvement that carried no probative value, the case against Yancy was not notably strengthened by the fact that he was a gang member. (*Id*. at pp. 193–195.) Further, the challenged evidence was relevant to the prosecution's case. For these reasons, we do not agree with Yancy that *Avitia* supports reversal of his convictions.

However, even if the evidence was improperly admitted, we agree with the Attorney General that it was not prejudicial. "The erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded." (*Avitia, supra*, 127 Cal.App.4th at p. 194.) Here, the evidence connecting Yancy to the crimes at issue was overwhelming. P.R. did not waiver in her identification of Yancy as one of the men who robbed her. In addition, the photographic and video evidence taken from Yancy's phone and the DNA found on the confiscated firearms was not called into question by any defense evidence. Even if Yancy's gang affiliation had been obscured, it is not reasonably probably that he would have obtained a more favorable result. Accordingly, any error with respect to the gang evidence was harmless.

C

*Child Protective Services Evidence*

Yancy next contends that the court erred by admitting statements between Yancy and his child's mother, R.R., concerning Child Protective Services (CPS). During a motion in limine conference, Yancy's counsel objected to admitting portions of a jail call made by Yancy to Dormevil in which Yancy mentioned R.R. was trying to get their child out of protective custody. Yancy's counsel argued the statements were irrelevant and highly prejudicial. The prosecutor stated that the information was relevant to give context to Yancy's arrest, explaining that the arrest occurred after a traffic stop the day before, unrelated to Yancy, led the police to the home where he was arrested. According to the prosecutor, when officers arrived at the home, they believed there was a child inside, causing them to conduct a protective

search of the home that revealed some of the firearms giving rise to charges in the instant case.

The court questioned the relevance of the statements about CPS, since the defense raised no issue as to why there had been a search of the home. The prosecutor responded that might be the case if the defense were willing to stipulate to the lawfulness of the search, and asserted there was nothing unduly prejudicial about the evidence. Yancy's counsel argued the statement was highly inflammatory since Yancy was not charged with child endangerment, and stated he would stipulate to the fact that the home was searched. The court initially ruled that the transcripts of the jail calls should be redacted to remove reference to CPS and child endangerment because they were prejudicial and not probative, and instructed Yancy's counsel to identify statements in the transcript that required redaction.

The next day, however, the court reconsidered and denied Yancy's request to redact the jail calls. The following day, Yancy's counsel asked for clarification as to the ruling. Defense counsel noted that the court had initially ruled in her favor and agreed that the jail calls should be redacted. The court responded that it was denying the request to redact the jail call, and that it found the statements were relevant because Yancy and R.R. were discussing what to do with the stolen Xbox, which had not been collected during the search of the home.

At trial, the jury was played a jail call between Yancy and Dormevil. In that call, Yancy stated that CPS took his child when law enforcement served a search warrant at a home based on events that had nothing to do with him. He stated that "they" were trying to figure out who was going to get the child out of CPS custody, and that law enforcement was trying to use the CPS proceeding as a means to increase his bail.

22

The jury was also played a recording of a call between Yancy and R.R. During that call, Yancy and R.R. discuss child custody issues and Yancy's stress over removal of the child from R.R. They also discuss the return of the Xbox to P.R. Specifically, R.R. mentions the idea of contacting P.R, but decides they would be accused of intimidating P.R. and that a third party, possibly R.R.'s son, should check in on P.R. instead. In a third jail call recording played for the jury between Yancy, R.R and another man, R.R. discusses missing her child, states that CPS was being "super strict" and that they thought she was a "brandishing kingpin operating [a] drug house," and that her child had been drug tested. In the call, Yancy and R.R. also briefly discuss returning the Xbox to P.R.

We agree with the Attorney General that the content of these three calls was probative to show Yancy's consciousness of guilt because he was attempting to orchestrate a way to return P.R.'s Xbox. The statements suggest Yancy thought he could avoid criminal liability by returning the stolen item. The conversations also suggest that because R.R. was being closely monitored by CPS, she and Yancy orchestrated a plan to have her sons return the Xbox, which was consistent with P.R.'s testimony that three men eventually returned it to her.

On the other side of the balancing test, the evidence was not so prejudicial that the trial court's decision to allow it constituted an abuse of discretion. The fact that Yancy had a child, who was living where weapons and drugs were found, leading to removal and involvement by child protective services—a logical outcome of the events leading to Yancy's arrest—is not so inflammatory that allowing the evidence exceeded the bounds of reason. (See *Montes, supra*, 58 Cal.4th at p. 859.)

23

Further, as with the gang evidence, the limited evidence admitted in the trial concerning CPS involvement with Yancy's child was not highly prejudicial. As discussed, the evidence connecting Yancy to the crimes with which he was charged was overwhelming. Even if the statements concerning CPS had been excluded from the trial, it is not reasonably probable that Yancy would have obtained a more favorable result. Accordingly, any error with respect to this evidence was harmless. (See *Avitia, supra*, 127 Cal.App.4th at p. 194)

D

*Human Trafficking Evidence*

1. *Additional Background*

The next category of evidence Yancy challenges are statements by P.R. and Detective Conrad suggesting that Yancy was a pimp. Specifically, during her direct examination, the prosecutor asked P.R. if she knew if Yancy "was pimping girls out?" P.R. responded that she did not know, Yancy's counsel objected to the question as leading, and the court overruled the objection. At a subsequent break outside the jury's presence, Yancy's counsel elaborated on her objection, asserting the question also assumed facts not in evidence. The court responded that its ruling allowing the question would stand.

After questioning of P.R. resumed, the prosecutor asked P.R. if she was working for Yancy; P.R. responded she was not. Yancy's counsel did not object and the court immediately recessed for its lunch break. Once the jury exited the courtroom, defense counsel complained that the question also assumed facts not in evidence. The prosecutor responded that he would be presenting additional evidence that suggested P.R. was working as a prostitute for Yancy in the form of text messages between them and also P.R.'s statements to a detective that investigated the robbery. The court

24

overruled the objection.  Then, during cross-examination, P.R. testified she never prostituted, sold drugs, or sold guns for Yancy.  She also clarified that she thought he was a pimp, but she was not sure.

During his direct examination, Conrad testified P.R. told him that during the robbery, Yancy said, "If you're not going to be my bitch, it's going to be bad for you."  Conrad told the jury this statement was consistent with human trafficking behavior.  Conrad further testified that P.R. denied being pimped, but told him she believed Yancy was "pimping out" other women.  In addition, while explaining the slang language used in text messages and images between Dormevil and Yancy in which they were communicating about drug and gun sales, Conrad explained that some of the texts suggested that the men were also engaging in human trafficking behavior.

During his closing argument, the prosecutor argued that the evidence suggesting Yancy was engaging in human trafficking activity, including trafficking, or attempting to traffic P.R., explained the inconsistencies in P.R.'s statements to police and during trial, and also explained Yancy's motive to take her Xbox.  The prosecutor asserted that Yancy and Dormevil's robbery was an exertion of power over her, not because they needed the Xbox, but because they wanted to control her.

2. *Analysis*

As an initial matter, as the Attorney General contends, Yancy's challenge to this evidence on appeal as improperly admitted under Evidence Code section 352 is forfeited by his counsel's failure to object on this basis during trial.  (See *People v. Pearson* (2013) 56 Cal.4th 393, 416 ["failure to

make a timely and specific objection on the ground [raised on appeal] forfeits the claim on appeal"].)

However, even if we reach the merits of the arguments, we agree with the Attorney General that this limited evidence about Yancy engaging in pimping activity was relevant to the prosecution's case and not unduly prejudicial. It provided context to the communications that evidenced both the robbery and Yancy's possession of various firearms, and explained the motive for the robbery. On the other side of the Evidence Code section 352 analysis, while the evidence was prejudicial—certainly the jury would be more inclined to think a pimp could commit robbery—given its relevance to the case, it was not so inflammatory that the trial court's decision to allow it exceeded the bounds of reason.

Further, like Yancy's other evidentiary challenges on appeal, even if the decision to allow the human trafficking evidence was error, the error was harmless. As stated, the evidence against him with respect to each charge was strong. Had P.R.'s statements indicating she thought Yancy was a pimp been excluded, it is not reasonably probable the jury would have reached a more favorable result on any of the charges levied against Yancy.

E

*Drug Sales Evidence*

Yancy also argues that the court's admission of evidence showing his involvement in drug sales was unduly prejudicial under Evidence Code section 352 and, thus, improperly admitted. Specifically, Yancy asserts the court improperly admitted: (1) a video of someone holding nuggets of marijuana that was taken from Dormevil's cell phone; (2) a video taken from Dormevil's phone showing 3.114 grams of cocaine on a scale, with plastic bags and other indicia of illegal narcotics also taken from Dormevil's phone; and

26

(3) various text messages and photos between Dormevil and Yancy suggesting drug sales and drug use.

Before trial, Dormevil's counsel moved in limine to exclude any drug sale evidence as irrelevant and substantially more prejudicial than probative. In response, the prosecutor asserted the evidence was relevant to show the general criminal enterprise Yancy and Dormevil were engaged in at the time, and also argued that P.R. may have stolen drugs from the defendants and that the Xbox was taken in retribution. The trial court ruled the evidence was admissible, explaining that "the People are allowed to present the larger picture to support their theory as to what was taking place between the alleged victim and these two gentlemen." At the conclusion of the discussion, the court stated that for purposes of appellate review, despite Yancy's counsel's silence, the court was joining Yancy in all objections to evidence that concerned him.

We agree with the Attorney General that the trial court did not err in admitting this evidence. As both the prosecutor and the court observed, the evidence was relevant to show that Yancy and Dormevil were involved in a criminal enterprise at the time of the robbery. Further, even if the evidence was improperly admitted, the majority concerned Dormevil, not Yancy, making it unlikely the jury drew adverse inferences about Yancy with respect to the evidence. Finally, the evidence at issue was minimal, especially in relation to the significant evidence presented concerning the charges against Yancy. It is not reasonably probable that the jury would have reached a more

favorable conclusion absent the evidence connecting him to drug sales.[8] (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

III

*Sufficiency of the Evidence Supporting the Felon in Possession Convictions*

Yancy's final contention on appeal is that there was not sufficient evidence to convict him of several of the felon in possession of a firearm charges (counts 6 through 8 and 10 through 21) and that the trial court improperly denied his motion under section 1181.1 for acquittal of the charges. He argues that evidence of the same guns was improperly used to support multiple convictions, and also contends the convictions must be reversed because there was no proof the guns at issue were real. The Attorney General responds that the photographs and videos entered into evidence establish that Yancy was liable for 15 counts of violating section 29800, and expert testimony and other evidence sufficiently established that the firearms were real. We agree with Yancy that insufficient evidence supports one of the convictions (count 14) because the same weapon was improperly used by the prosecution to support two separate charges. We

---

[8]     We also reject Yancy's assertion that even if the evidentiary errors he asserts alone do no warrant reversal, their cumulative effect does. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) Finding no abuse of discretion in the trial court's evidentiary rulings, we conclude Yancy's claim of cumulative error also fails.

reject Yancy's assertion that there was insufficient evidence to support the 14 other convictions for felon in possession of a firearm.

A

No one who has been convicted of a felony may lawfully own, purchase, receive, possess, or have custody or control of any firearm. (§ 29800.) The possession, custody, or control of the firearm must be with the defendant's knowledge. (*People v. Snyder* (1982) 32 Cal.3d 590, 592 [analyzing former § 12021, subd. (a)(1), the predecessor statute to § 29800].) "Possession may be physical or constructive, and more than one person may possess the same contraband. [Citation.] Possession may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410 (*Miranda*).)

In assessing whether there is sufficient evidence to sustain a criminal conviction, we apply the substantial evidence standard of review. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212.) Under that standard, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144.) We " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence[,]' " and we " 'may not substitute [our] judgment for that of the jury.' " (*Ibid*.) "We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency. [Citation.] Rather, before we can set aside a judgment of conviction for insufficiency of the evidence, 'it

29

must clearly appear that upon no hypothesis whatever is there sufficient evidence to support [the jury's finding].' " (*Id*. at p. 145.)

"Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction. [Citation.] Nevertheless, 'substantial evidence,' that is, evidence that is ' " 'reasonable ..., credible, and of solid value' " ' is required, not just *any* evidence. [Citation.] In particular, a reasonable inference from the evidence ' " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] ... A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence.' " ' " (*People v. Sanford* (2017) 11 Cal.App.5th 84, 91–92; see also *People v. Davis* (2013) 57 Cal.4th 353, 360 [" 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).)"].) "An appellate court reviews the denial of a section 1118.1 motion [for a judgment of acquittal for insufficient evidence] under the standard employed in reviewing the sufficiency of the evidence to support a conviction." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

B

Yancy asserts that two of his convictions for felon in possession of a firearm must be reversed because the sole evidence supporting them is photographs of the same firearms used to support other counts of the same charge. Specifically, he argues that the evidence of counts 4 and 16 consisted of photographs of the same firearm such that only one of the two convictions should stand. Likewise, he argues that the photograph of the firearm giving rise to count 10 appeared to depict one of the same firearms that the

30

prosecutor used to support counts 20 and 21, such that either the conviction for count 10 should be reversed or his convictions for counts 20 and 21 should be reversed. The Attorney General responds that because nothing in the record suggests Yancy's possession of these different firearms was continuous, the convictions should stand.

To support his argument, Yancy relies on this court's decision in *People v. Mason* (2014) 232 Cal.App.4th 355 (*Mason*). In *Mason*, the defendant was convicted of four counts of possession of a firearm by a felon under former section 12021, subdivision (a)(1). (*Mason,* at p. 364.) Each possession count corresponded to the date of a different shooting or the date a police chase led to the recovery of the firearm used in the shootings. (*Ibid.*) The prosecution's theory was that the defendant possessed the firearm on each of these occasions such that each occasion gave rise to a separate offense. (*Ibid.*) Accordingly, this court reversed all but one of the convictions. (*Id.* at p. 367.)

In *Mason*, we stated "[t]he Supreme Court has recognized that possession of a firearm by a felon is a continuing offense." (*Mason, supra*, 232 Cal.App.4th at p. 365.) " ' "Ordinarily, a continuing offense is marked by a continuing duty in the defendant to do an act which he [or she] fails to do. The offense continues as long as the duty persists, and there is a failure to perform that duty." [Citations.] Thus, when the law imposes an affirmative obligation to act, the violation is *complete* at the first instance the elements are met. It is nevertheless not *completed* as long as the obligation remains unfulfilled. "The crime achieves no finality until such time." ' " (*Ibid.*) In other words, " 'only one violation occurs even though the proscribed conduct may extend over [an] indefinite period.' " (*Ibid.*)

Applying this concept, we reasoned in *Mason* that, "[a]lthough the evidence showed that Mason possessed the firearm on each of the dates, there

was no evidence that Mason's possession of the firearm was anything but continuous over the period encompassing the four dates.  The prosecution did not present evidence, for example, showing that Mason had relinquished possession of the gun for a period between the specified dates.  Mason's crime was complete at the time he first possessed the gun because he violated the duty imposed by the statute not to do so.  [Citation.]  But the crime continued—as a single offense—for as long as the same possession continued, i.e., so long as Mason continued to violate his duty under the statute."  (*Mason, supra*, 232 Cal.App.4th at p. 366.)

Like *Mason*, in which the evidence showed the defendant possessed the same firearm without interruption at the time of each charged offense (a series of four separate shootings), there was insufficient evidence to support the jury's finding that possession of one of these weapons underlying the felon in possession charges was not continuous.  Specifically, in support of the charge set forth in count 6, the prosecutor offered a photograph from March 11, 2020, and to support count 14, the prosecutor offered a video from October 21, 2020.  However, the weapon in both of these depictions appears to be the same, and very distinctive, black and pink gun.  As the Attorney General acknowledges, it was the prosecution's burden to prove that the weapons were different, or that Yancy's possession of the weapon was not continuous over the entire time period.  Here, the prosecutor did not distinguish the guns in these photos at all.  Accordingly, we agree with Yancy that the evidence was insufficient to support a conviction for both counts 6 and 14 and, thus, we conclude that count 14 must be reversed for lack of evidence.

The guns at issue in count 10 and counts 21 and 22 (two of the three guns seized from the home where Yancy was arrested), however, do not

32

appear to be the same weapon. The photos identifying the weapon corresponding to count 10, and those corresponding to counts 21 and 22 do not appear to depict the same gun (though the style of weapons is similar, the handgrip is different). It is not this court's role to reassess the evidence presented to the jury and, as the Attorney General asserts, Yancy did not raise this issue in the trial court. Accordingly, we conclude the evidence supporting counts 10, 21, and 22, establishing different weapons underlying each charge, was sufficient to support the jury's corresponding convictions.

Yancy next contends insufficient evidence supports counts 6 through 8 and 10 through 19 because no gun was found to support the charges, and instead they were based solely on photographic evidence, some of which did not depict Yancy with the weapons. We disagree with Yancy's argument and conclude substantial evidence also supported the jury's conviction on each of these counts.

Each count was supported by photographic evidence of weapons taken directly from Yancy's cell phone. All of the photographs were in Yancy's camera roll on his phone, and not images sent to him via text message or otherwise. Further, the prosecution presented evidence suggesting Yancy was selling these firearms. This evidence included photographs of the various weapons with sales prices listed, text message exchanges between Yancy and Dormevil discussing the price of firearms, photographs of Yancy with the weapons, and expert testimony opining that the images showed Yancy was in possession of these guns and was selling them. Finally, the prosecution presented evidence of three actual firearms seized on November 17, 2020, which had DNA connecting the weapons to Yancy. From this evidence, a trier of fact could reasonably infer that Yancy possessed all of the firearms at issue, including those depicted in photographs and videos on his

phone, regardless of whether he was in the picture with the weapons or not. (See *Miranda, supra*, 192 Cal.App.4th at p. 410 ["Possession may be physical or constructive, and more than one person may possess the same contraband."].)

Finally, Yancy argues that there was insufficient evidence showing that the guns were real. This assertion is also not well-taken. Rather, ample evidence in the trial court showed the firearms were real. The photographs found on Yancy's phone of the firearms and their sale prices strongly suggested he was selling the guns. Text messages exchanged between Yancy and Dormevil discussing the price of firearms also showed the guns were for sale. Importantly, Detective Conrad opined that the firearms in the photographs and videos were real because real firearms and ammunition were found at the home where Yancy was arrested and because the guns' prices were consistent with those of actual firearms, not prices of replicas or fake weapons.

Accordingly, substantial evidence showed that the guns at issue, as depicted in the photographs and videos, were real firearms. Reversal on this basis, therefore, is not warranted. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331 [a conviction can be reversed only where there is " 'no hypothesis whatever' " upon which the evidence can be deemed sufficient to support it].)

## DISPOSITION

The judgment is reversed as to count 14 and otherwise affirmed in its entirety.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

RUBIN, J.